TIMOTHY BRENNAN, DEFENDANT IN ERROR, v. UNITED HATTERS OF NORTH AMERICA, LOCAL No. 17, ET AL., PLAINTIFFS IN ERROR.

Submitted March 26, 1906—Decided November 19, 1906.

1. Plaintiff was a member of a trade union (a voluntary association) whose rules provided for fining and otherwise punishing any member violating the laws of the association or the rules of trade. The rules provided for a trial of the accused member before a tribunal established within the association, at the same time providing that he should be entitled to "due notice and a fair trial," and should not be put on trial unless charges were submitted in writing by a member of the association. Plaintiff having been put on trial without the submission of written charges and without due notice, was sentenced to pay a fine and to give up his place of employment for one year. *Held*, that this course of procedure, unless consented to by plaintiff, furnished no justification for the subsequent action of the association and its officers in procuring his discharge from employment.

2. Whether plaintiff did consent to be put on trial without charges or notice, was, under the evidence in this case, a question for the jury.

3. The constitution of this state (article 1, paragraph 1) establishes the unalienable right of all men to acquire property and pursue and obtain safety and happiness; included in this is the right of making contracts for personal services as a means of acquiring property. It is therefore the right of every man to engage in such lawful business or occupation as he may choose, free from hindrance or obstruction by his fellow-men, saving such as may result from the exercise of equal or superior rights on their part.

4. Whoever intentionally and without legal justification or excuse, procures an employer to discharge his employe, to the damage of the latter, is liable to an action for damages at the suit of the employe; and this, although there was no binding contract of employment.

5. Malice, in the law, is the intentional doing of a wrongful act, without justification or excuse. A "wrongful act," within the meaning of this definition, is any act which in the ordinary course will infringe upon the rights of another to his damage, except it be done in the exercise of an equal or superior right.

6. Where a party has entered into an agreement that is void because contrary to public policy, he may, on repudiating such agreement, recover upon a ground of action that exists independent thereof. His suit is not barred by the operation of the maxim *in pari delicto*.

On error to the Essex Circuit Court.

For the plaintiffs in error, *Riker & Riker*.

For the defendant in error, *Howe & Davis*.

The opinion of the court was delivered by

PITNEY, J. This was an action of tort brought to recover damages sustained by the plaintiff through interference by the defendants with his employment in his trade as a hatter. Plaintiff was a member of Local Union No. 17 of the United Hatters of North America. The defendants are this local union (sued, under *Pamph. L.* 1885, *p.* 26, as a voluntary association consisting of more than seven members) and twelve individuals, one of whom was the secretary of the union, and the other eleven constituted a committee thereof, known as the "vigilance committee."

The plaintiff's declaration contains three counts, of which the first indicates the ground of recovery that is established by the verdict. It alleges, in substance, that plaintiff was a member of the "United Hatters of North America, Local No. 17," and was employed by a firm of E. V. Connett & Company, in the trade and occupation of the manufacture of hats, in the capacity of foreman; that he was authorized, under the constitution and by-laws of the United Hatters, to act in such capacity, and was enjoying the benefit of a membership card, issued by that association, certifying to his good standing; that the association and the individual defendants constituting its vigilance committee, in order to

injure the plaintiff in his said trade and occupation, on August 6th, 1902, maliciously and without reasonable or probable cause, pretending that plaintiff had violated the laws of the defendant "United Hatters of North America, Local No. 17," and without serving the plaintiff with written charges of the alleged violation, and without giving him notice of the hearing of said charges, adjudged the plaintiff to be guilty thereof, and directed that a fine of $500 be levied upon him; that afterwards, on September 4th, 1902, at a meeting of the defendant "United Hatters of North America, Local No. 17," the decision of the defendants adjudging the plaintiff guilty as aforesaid was reversed and set aside; that by reason of the plaintiff's refusal to pay the said fine the defendants withdrew from him the benefit of his membership card, by means whereof the said Connett & Company were compelled to, and did, refuse to continue the plaintiff in their employ, as they otherwise would have done, and by reason thereof the plaintiff was prevented from exercising his trade and occupation of a hat manufacturer and from obtaining any engagement or employment therein. As to this count the defendants pleaded the general issue—not guilty.

A trial being had before the judge of the Essex Circuit Court and a jury, there was a general verdict in favor of the plaintiff, and the consequent judgment is now before us for review. The assignments of error relate to certain rulings of the trial judge that are evidenced by bills of exceptions.

It appears that plaintiff was a member in good standing of the United Hatters' union, and was working in Connett's factory as one of several hundred men, all of whom belonged to the same union. He was a foreman, in receipt of $18 per week as wages. By the rules of the union no man could be employed in such a shop unless his membership card or check was on deposit with the shop steward, who was an agent of the union at the factory. By the same rules members of the union were not permitted to work in the shop together with any man who was not a member of the union or not in possession of his card. The union included within its juris-

diction about two thousand two hundred men, employed in about fifteen different factories, situate in a district comprising Orange, Hackettstown, Bloomfield, Millburn and Livingston. All the hat factories in this district were under the jurdisdiction of the same union. By an agreement made between the union and the manufacturers, every man employed in any of these factories must have a membership card on deposit with the shop steward.

It appears that by the rules of the union the association has power to fine and reprimand or otherwise punish any member violating the laws of the association or the rules of trade. The vigilance committee has power to transact any business pertaining to the welfare of the trade in the time intervening between the regular meetings of the union. By the rule relating to "Trial and Appeal," it is provided as follows: "Any member of this association shall be entitled to due notice and a fair trial upon being accused of any violation of its laws or the rules of trade, but no member shall be put on trial unless charges are submitted in writing by a member of the association."

It appears that on August 5th, 1902, a meeting of the vigilance committee was held, at the instance of two members of the association named Sereno and Alvino, to investigate a complaint made by them on the authority of Foreman Brennan (the plaintiff herein) against one Trancone, to the effect that Trancone had accused them (Sereno and Alvino) of lying in wait around Brennan's house for the purpose of doing him some injury. Brennan was called before the meeting as a witness. Trancone appears to have been present as the party accused. Each was examined by the committee in the absence of the other. It appears from the minutes that in the course of the investigation Trancone stated to the committee (in Brennan's absence) that he himself had on several occasions paid Brennan small sums of money "to get good work," and that one Panegraso had given money to Brennan for the same purpose. Trancone having retired from the presence of the committee, Brennan was recalled,

and the statement made by Trancone before the committee was read to him. Brennan denied it. The committee then called Trancone before Brennan to verify his statement. Trancone declared that his statement was true in every particular, and Brennan again denied the charge. Subsequently, at the same meeting, Panegraso came before the committee, under escort of Brennan, "as a witness to prove that Trancone lied." Trancone was recalled and reaffirmed his accusation in the presence of Brennan, Panegraso and the committee. Thereupon all parties were notified to appear before the committee on the following afternoon (August 6th). Upon that date another meeting of the vigilance committee was held, concerning which the minutes disclose only the following: "Timothy Brennan's case was then taken up, and Michael Panegraso was called before the committee to answer the charge that he had ever given money to Brennan. He denied that he had ever given money to Brennan. Mr. Brennan was called and admitted having met Panegraso in Bloomfield. Motion that Michael Panegraso and Benedetto Trancone be fined the sum of $500 each, $250 down and $5 per week, carried. Motion that Mr. Brennan be fined the sum of $500, $250 down and $1 per week, and to give up his place as foreman for the space of one year in Connett's hat factory, carried unanimously."

This action of the vigilance committee was reported to a meeting of the association held on the following day (August 7th), and a motion was carried that the report be adopted as read. It should be observed that this ratification by the association of the action of its committee is not mentioned in the plaintiff's declaration herein. In order to sustain the judgment under review, the declaration will be treated as amended, if necessary, in this regard.

On August 15th the secretary of the union (who is one of the defendants herein) went to Connett's hat factory, where Brennan was working, explained to him the action taken by the vigilance committee and by the meeting of the association, and demanded payment of the $250. Brennan refused to pay

it, and the secretary thereupon went to the shop steward and took Brennan's check from the box. It is inferable from the evidence that this was done by the secretary in the regular course of his duty, and that in doing it he acted as agent for the association.

Afterwards, and on the same day, Brennan's counsel wrote to the union, protesting against the action taken, on the ground that no charges had been preferred nor any notice of a trial or hearing given to him, as required by the laws of the association. Subsequently, and under date of August 17th, a charge was preferred in writing by Trancone, and Brennan was notified of a hearing before the vigilance committee to be held on the 18th. He declined to attend on the ground that he could not appear legally until his card was returned to him, and on the further ground that members of the vigilance committee had made public statements showing that they were prejudiced against him.

At a meeting of the association held on September 4th a motion that Brennan be exonerated was carried by a two-thirds vote. Shortly thereafter his card was returned to him and he went back to work in the Connett factory.

On August 15th, a few minutes after the secretary of the union took up Brennan's membership card, he was discharged by the head foreman on the ground that Brennan no longer had his check in the box. Upon being exonerated by the union, Brennan informed the head foreman of the fact, and was immediately re-employed.

The trial judge, having denied a motion for nonsuit made at the close of the plaintiff's case, and a motion for direction of a verdict in defendants' favor made at the close of the whole case, submitted the issue to the jury, with instructions to the effect that if they found the plaintiff had sustained damage from the acts of the defendants in the premises, and if the vigilance committee proceeded against the plaintiff without charges submitted in writing, without notice to the plaintiff, or without fair trial, then, unless the plaintiff had waived his rights by submitting himself to the jurisdiction

of the vigilance committee or of the association, he was entitled to recover to the extent of the pecuniary injury that was the natural result of the action of the defendants. Other and more questionable elements of damage were included in the instructions, but any ground of complaint in this regard was waived upon the argument here.

Reversal is asked upon only two grounds, both of which are assumed to have been raised in the motion for nonsuit and for direction of a verdict, viz.:

*First.* That the suspension or expulsion of a member of a labor union (it being a voluntary, unincorporated association), in cases where no property rights are involved, cannot support a claim for damages against the union by the member so expelled or suspended.

And, *secondly,* that the plaintiff had no right to complain of his trial and consequent suspension, and this on the ground that the charge made by Trancone against him was put in writing and read to the plaintiff; that he participated in the trial before the vigilance committee and produced witnesses who testified in his behalf; that he received notice of the hearing before the committee upon the second day, at which hearing he attended, with witnesses, and was tried in accordance with the rules and by-laws of the association; and that he waived any formalities that may not have been strictly observed by failing to object to the proceedings for irregularity.

To deal with the second point first. We make no question that the subject-matter of the charges—the acceptance from a workman of a bribe, intended to secure favorable terms of employment—involving, manifestly, a gross breach of Brennan's duty to his employer, as well as to his fellow-employes, and involving moral turpitude as well, was within the jurisdiction of the vigilance committee, although no written rule is cited to that effect. But jurisdiction of the subject-matter was not alone sufficient to entitle the committee to proceed. According to the express requirement of the by-laws of the association, jurisdiction over the person of the party accused must first be acquired by the submission of written charges

and the giving of due notice to the accused. By "due notice" is meant, of course, notice that he is to be put upon trial at a specified time upon specified charges, and the notice must be given in season to afford him a reasonable opportunity to make preparation to meet the charges by summoning witnesses in his behalf. The by-law likewise entitles the member accused to "a fair trial." Just what this phrase imports, and how far and under what circumstances the courts of law could properly ignore the results of a trial had under such a by-law, on the ground that it was not a fair trial, we find it unnecessary to determine. For we are of opinion that, clearly, the plaintiff in the case at hand was put upon trial without charges submitted in writing by a member of the association, and without due notice, such as are prescribed by the by-laws of the association. It results, therefore, that the vigilance committee acted without jurisdiction unless plaintiff by his own conduct consented that they should proceed. With respect to his consent, there was, we think, at least a disputable question for the jury's determination. It is clear enough that at the meeting of August 5th the plaintiff was informed that Trancone had made an accusation reflecting upon his integrity. But Brennan was then present as a witness respecting a charge that had been made against Trancone, and he may well have supposed that Trancone's accusation against him was under consideration by the committee solely as it affected his credibility as a witness. It is not clear that Brennan knew, on the 5th, that the committee meeting appointed for the following afternoon was to take up Trancone's accusation as a basis of action against him (Brennan). So far as the proceedings of August 6th are concerned, it does not appear that Brennan was then notified that the committee had his case under consideration.

It is suggested that Brennan, by an appeal to the association, taken after his discharge from the Connett factory, submitted himself to the jurisdiction. The grounds of this appeal and the circumstances under which it was taken do not appear, nor does it clearly appear that any formal appeal

was taken.    If taken, the appeal may be presumed to have
been based upon the ground that the vigilance committee had
acted without jurisdiction, so that the whole proceedings were
void.    It certainly cannot be held that by the mere taking
of an appeal to the association he assented to the jurisdiction
of the very tribunal whose proceedings were to be reviewed.

To return, now, to the first and main question raised by
plaintiff in error.    We think too narrow a view is taken of
the plaintiff's ground of action when it is regarded as resting
merely upon his suspension from the labor union.    In our
opinion, the gist of the action is the damage caused to the
plaintiff by an unwarranted interference with him in his em-
ployment as a hatter.    If the framer of the declaration, in-
stead of including in that pleading averments respecting the
proceedings of the vigilance committee and of the other de-
fendants that eventuated in the withdrawal of the plaintiff's
membership card, had contented himself with averring that
defendants had unlawfully and without just cause or excuse
procured plaintiff's discharge by his employer, it would, as
we think, have set forth the material averment upon which
his right of action depends.    Defendants might then have
pleaded that his discharge resulted solely from the with-
drawal of his membership card, and that this resulted from
his conviction of an offence against the rules of trade, after
a fair trial had upon charges submitted by a member in
writing, and on due notice to the plaintiff in accordance with
the laws of the association of which he was a member.    This
course of pleading would have presented the so-called trial
and conviction of the plaintiff in its true light, as an alleged
justification or excuse for the action of the defendants in
procuring his dismissal from employment.

No doubt plaintiff's membership in the defendant asso-
ciation imports his consent (so far as he had lawful power to
give consent) to the discipline of the association, if carried
out in good faith and without malice, through the methods
prescribed by the laws of the association and in accordance
with the principles of natural justice.    Assuming the de-
fendant association to have been organized for lawful pur-

poses only, plaintiff had lawful power to give his consent to its discipline, to be exercised in furtherance of such purposes. And, assuming that the method adopted by the defendant association of establishing an agreement with the manufacturing hatters in all the factories throughout an extensive district, to the effect that none but members of the association should be employed in their shops, was not unlawful, the plaintiff might assent that upon his being in due course suspended from membership in the association, after a proper conviction upon charges submitted and tried in accordance with its rules, he should lose his place of employment and his opportunity of gaining other employment within the district.

We say *assuming* such an agreement not to be unlawful because in our view its lawfulness admits of question. In *Curran* v. *Galen,* 152 *N. Y.* 33, certain brewery companies in the city of Rochester, having formed themselves into a brewers' association, made an agreement with a labor union, composed of workmen employed in the brewing business in that city, to the effect that all employes of the brewery companies should be members of the union, and that no employe should work for a period longer than four weeks without becoming a member. It was held (as we read the opinion) that the purpose of the union, that no employe of a brewing company should be allowed to work without becoming a member of the union, and that the contract referred to should be availed of to compel the discharge of an independent employe, was, in effect, a threat to keep persons from working at the particular trade and to procure their dismissal from employment; and that this plan of compelling workmen, not in affiliation with the organization, to join it at the peril of being deprived of their employment and of the means of making a livelihood, was unlawful. In the more recent case of *Jacobs* v. *Cohen,* 183 *N. Y.* 207, a contract between a single firm of employers and a labor union, whereby the firm agreed for a certain period to employ and retain only members of the union, and the latter for the same period bound themselves to furnish the services of its members, was

held not violative of public policy, on the ground, among others (see *p.* 211), that "its restrictions were not of an oppressive nature, operating generally in a community to prevent such craftsmen from obtaining employment and from earning their livelihood." Whether these decisions are consistent with each other is a question that may require consideration at a future time. At the same time, *Protective Association* v. *Cumming,* 170 *Id.* 315, may come under consideration. *Plant* v. *Woods,* 176 *Mass.* 492; *Berry* v. *Donovan,* 188 *Id.* 353, and many of the cases cited below, may also throw light upon the lawfulness of such a trade agreement.

In the present case, indeed, it is argued, and with much force, by the learned counsel for plaintiff in error, that the value of the right of membership in the defendant association consists in participation in a more or less complete monopoly of the labor market in the particular trade in question; that so far as labor unions are organized for the purpose of monopolizing to their members the labor market in any particular trade, that purpose constitutes such unions unlawful associations, and that the plaintiff's right to retain employment or to secure new employment was so dependent upon his participation in such an unlawful monopoly that his suit for damages arising out of a disturbance of this right is not to be sustained.

This argument has an odd sound, proceeding as it does from the labor organization itself, for if the purposes of the defendant association, as disclosed in the record before us, be in truth unlawful, that circumstance does not, in our view, tend to overthrow the judgment under review. The plaintiff's right of action, as we regard it, does not rest upon any assertion of the alleged monopoly, but upon a repudiation of the very course of procedure that was invoked in his case to establish the monopoly. It is settled that where a party has entered into an agreement that is void because contrary to public policy, his right to recover upon a ground of action that exists independent of the agreement is not overthrown

by the operation of the maxim *in pari delicto*. *Cone* v. *Russell*, 3 *Dick. Ch. Rep.* 208, 217, and cases cited; *Easton National Bank* v. *American Brick and Tile Co.* (Green's appeal), decided by this court in June last; see, also, *Delaware, Lackawanna and Western Railroad Co.* v. *Trautwein*, 23 *Vroom* 169; *Newbury* v. *Luke*, 39 *Id.* 189.

But the question thus argued by counsel for plaintiff in error does not, as we take it, press for determination in this case. Had plaintiff's discharge from employment resulted from a due course of procedure had against him in the association, in accordance with the by-laws to which he had given his consent, and had such procedure been set up as a justification or excuse for those who procured his discharge, he might have raised the question of the unlawfulness of the trade agreement with the manufacturing hatters in order to show that the alleged excuse or justification was not a lawful one.

But since upon the record before us it must be held that plaintiff's suspension from the association and the consequent withdrawal of his membership card were not warranted by the laws of the association, because the tribunal that tried him acted without jurisdiction, it is unnecessary to pursue the inquiry whether the defendant association, by establishing a trade agreement that tended to promote a monopoly and to deprive workmen in the hatter's craft of a fair opportunity to obtain employment, had violated the law or the public policy of this state.

Stripped, therefore, of all redundant matters, the question presented is whether the acts of the defendants, including the unwarranted conviction of the plaintiff by the vigilance committee, their sentence that he should pay a money fine and give up for one year his position as foreman in the Connett factory, the ratification of this conviction and sentence by the defendant association, and the consequent withdrawal of plaintiff's membership card from the steward at the factory, when the natural and proximate result of that course of action, intended and designed by the defendants to ensue, was

to interfere with the plaintiff's continued employment in the factory, and thereby prevent him from gaining a livelihood for himself and his family, followed by actual damage accruing to the plaintiff in the premises, constitute an actionable injury.

We say that the natural and proximate result of withdrawing the plaintiff's membership card was his dismissal from the factory, because such was not only a reasonable inference to be drawn by the jury from the evidence, but indeed was the only reasonable inference. Upon the evidence, the membership card was the token, and the only token, that manifested plaintiff's right to continued employment in the factory under the trade agreement already referred to. That agreement was not of itself the proximate cause of his dismissal, but merely produced the condition under which the withdrawal of the card became effective in procuring his dismissal. The evidence is clear that it was because of the withdrawal of the card, and for that reason only, that the superintendent of the factory discharged the plaintiff, and that his refusal to do so would at once have put the factory out of business by the refusal of all the other men to continue at work. We say, also, that the plaintiff's discharge was intended and designed by the defendants to ensue. It is true that the immediate occasion of the withdrawal of the card was plaintiff's refusal to pay the fine. But that fine having been unwarrantably imposed upon him, he of course was justified in refusing to pay it. And since the defendants were charged with notice of the facts that show the fine was unwarranted, they were not entitled to anticipate that the plaintiff would submit to pay it. Moreover, a part of the penalty imposed, in addition to the fine, was that plaintiff should give up for one year his place as foreman in the factory. Defendants had no right to assume that plaintiff would be willing to continue in any other grade of employment, nor that the Messrs. Connett would give him other employment if the plaintiff were willing to accept it.

In dealing with the question of the plaintiff's right to

recover, it is to be observed that the action taken by the defendants was not in the course of any legitimate competition for the place held by the plaintiff in the factory, but was taken in order to discipline and punish him for an offence of which he was presumably innocent, and of which he had not been duly found guilty.

The common law has long recognized as a part of the boasted liberty of the citizen the right of every man to freely engage in such lawful business or occupation as he himself may choose, free from hindrance or obstruction by his fellow-men, saving such as may result from the exercise of equal or superior rights on their part—such, for instance, as the right of fair competition in the like field of human effort—and saving, of course, such other hindrance or obstruction as may be legally excused or justified.

This right is declared by our constitution to be unalienable. The first section of the bill of rights sets forth that "All men are by nature free and independent, and have certain natural and unalienable rights, among which are those of enjoying and defending life and liberty, acquiring, possessing and protecting property, and of pursuing and obtaining safety and happiness."

As a part of the right of acquiring property there resides in every man the right of making contracts for the purchase and sale of property, and contracts for personal services, which amount to the purchase and sale of labor. It makes little difference whether the right that underlies contracts of the latter sort is called a personal right or a property right. It seems to us impossible to draw a distinction between a right of property and a right of acquiring property that will make a disturbance of the latter right any less actionable than a disturbance of the former. In a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it. The cup of Tantalus would be a

fitting symbol for such a mockery. Our constitution recognizes no such notion.

Actions like the present, although they have been treated by some judges in recent years as a comparative novelty, do not, in our opinion, rest upon any novel principle. They are essentially analogous to the familiar action for enticing away one's servant. In such cases, as was said by Justice Van Syckel, in *Noice, Administratrix,* v. *Brown,* 10 *Vroom* 572: "It is well settled that a person who, knowing the premises, induces another to break a subsisting contract of service, is liable to an action for the damages which ensue to the employer. Whether an action will lie when there is no binding contract to continue in service is perhaps not so clear; but I think it may be maintained, both upon reason and authority, where it is merely a subsisting service at will. In such service, like a tenancy at will, their relation must be ended in some way before the rights of the master can be lost. By the unwarrantable interference of a third party the employer is deprived of what he otherwise might have retained."

In *Hughes* v. *McDonough,* 14 *Vroom* 460, our Supreme Court sustained an action brought by a blacksmith on the ground that he had shod a mare for one of his customers, Van Riper, in a good and workmanlike manner; that the defendant, maliciously intending to injure plaintiff in his trade, did impair and destroy the work done and performed by the plaintiff upon the mare by loosening a shoe which was recently put on by the plaintiff, so that if the mare was driven the shoe would come off easily, and thus make it appear that the plaintiff was an unskillful and careless horseshoer, and that the mare was not shod in a good, workmanlike manner, and thus deprive the plaintiff of the patronage and custom of Van Riper. Among the illustrative cases cited is *Keeble* v. *Hetheringill,* 11 *East* 574n, the famous "decoy case."

In *Van Horn* v. *Van Horn,* 27 *Vroom* 318, this court sustained an action against a single defendant for injuring the plaintiff's business by false and malicious statements con-

cerning his character. Many English cases were cited, among them *Lumley* v. *Gye*, 2 *El. & B.* 216, and *Bowen* v. *Hall*, *L. R.*, 6 *Q. B. Div.* 333; also the Massachusetts case of *Walker* v. *Cronin*, 107 *Mass.* 555. Justice Van Syckel said that "the rule to be deduced from the cases is that while a trader may lawfully engage in the sharpest competition with those in the like business, by representing his own wares to be better, * * * yet, when he oversteps that line and commits an act with the malicious intent of inflicting injury upon his rival's business, his conduct is illegal, and if damage results the injured party is entitled to redress. Nor does it matter whether the wrong-doer effects his object by persuasion or by false representation. The courts look through the instrumentality or means used to the wrong perpetrated with a malicious intent, and base the right of action upon that."

Our Court of Chancery, in *Barr* v. *Essex Trades Council*, 8 *Dick. Ch. Rep.* 101, 115; *Frank & Dugan* v. *Herold*, 18 *Id.* 443, and *Jersey City Printing Co.* v. *Cassidy*, *Id.* 759, has affirmed the right of the citizen to conduct his business free from malicious interference, including his right to have free opportunity to hire employes. And we may remark that the right of one seeking employment to have free opportunity to gain employment, and to retain a position of employment once it is gained, is as precious in the eye of the law as the right of the employer.

The above cases illustrate the views that our courts have taken of cognate questions. We recall no case in this state that is precisely in point with the present.

In examining reported decisions in other jurisdictions, we frequently find the question of malice discussed—malice being commonly treated as an essential ingredient of an action like the present. But malice in the law means nothing more than the intentional doing of a wrongful act without justification or excuse. *King* v. *Paterson*, 20 *Vroom* 417; *McFadden* v. *Lane*, 42 *Id.* 624, 630. And what is a wrongful act within the meaning of this definition? We answer, any act which in the ordinary course will infringe upon the rights of another to his damage is wrongful, except it be done in

the exercise of an equal or superior right. In *Mogul Steamship Co.* v. *McGregor,* 23 *Q. B. Div.* 598, 613, Lord Justice Bowen said: "Now, intentionally to do that which is calculated in the ordinary course of events to damage, and which does in fact ·damage another in that other person's property or trade, is actionable if done without just cause or .excuse. Such intentional action, when done without just cause or excuse, is what the law calls a malicious wrong." This statement was cited with approval by Vice·Chancellor Green, in *Barr* v. *Essex Trades Council,* 8 *Dick. Ch. Rep.* 101, 117. In our opinion it is a correct statement of the law and is as applicable to acts affecting a man's right to secure and retain employment as to .his right to acquire and retain property or trade.

In *Walker* v. *Cronin,* 107 *Mass.* 555, the declaration averred that the plaintiff was a manufacturer of shoes, and for the prosecution of his business it was necessary for him to employ many shoemakers, and the defendant, knowing this, unlawfully and without justifiable cause, molested him in carrying on said business with the unlawful purpose of preventing him from carrying it on, and willfully induced many shoemakers who were in his employ, and others who were about to enter into it, to abandon it without his consent and against his will, .whereby the plaintiff lost their services and the profits that he would otherwise derive therefrom, and was put to expense to procure other workmen. The court sustained the right of action. See, also, *Martell* v. *White,* 185 *Id.* 255, and *Berry* v. *Donovan,* 188 *Id.* 353, two recent and instructive cases.

A very recent Connecticut decision may also be noted— *March* v. *Bricklayers' and Plasterers' Union,* 63 *Atl. Rep.* 291.

In *Bowen* v. *Hall* (1881), 6 *Q. B. Div.* 333, it was held by the Court of Appeal that an action lies against a third party who maliciously induces another to break his contract of exclusive personal service with an employer, which thereby would naturally cause and did in fact cause an injury to

such employer, although the relation of master and servant did not strictly exist between the employer and employe.

In *Temperton* v. *Russell* (1893), 1 *Q. B. Div.* 715, a firm of builders had refused to obey certain rules laid down by the union with regard to building operations, whereupon the union sought to compel them to do so by preventing the supply of building materials to them. For this purpose they asked the plaintiff, who was a master builder supplying materials to the firm, to cease to supply them with such materials, but the plaintiff refused to do so. Thereupon, with the object of injuring the plaintiff in his business, in order to compel him to comply with such request, the defendants induced persons who, to the knowledge of the defendants, had entered into contracts with the plaintiff for the supply of materials to break their contracts and not to enter into further contracts with the plaintiff, by threatening that the workmen would be withdrawn from their employ. The plaintiff having sustained damage in the premises, it was held that an action was maintainable by him against the defendants for maliciously procuring such breaches of contract, and also for maliciously conspiring together to injure him by preventing persons from entering into contracts with him.

The celebrated case of *Allen* v. *Flood* (1898), *A. C.* 1, is cited by the learned counsel for plaintiff in error herein. It arose in the year 1894 out of a dispute between certain boilermakers, members of a trade union which sought to assume to itself the sole control of the ironwork in shipbuilding, and certain members of the shipwrights' union who assumed the right to work in shipbuilding, whether upon woodwork or ironwork. Flood and Taylor, the plaintiffs, who were shipwrights, were employed by the Glengall Iron Company in repairing a ship, doing the woodwork thereon only, and no ironwork. Certain boilermakers, members of the boilermakers' union, on discovering that the plaintiffs had previously been employed by another firm on the Thames in doing ironwork on a ship, threatened to strike. One of them telegraphed to London for the defendant Allen, who was the

walking delegate of the boilermakers' union. He came to the shipyard, and on being told that the iron men threatened to strike, he had an interview with the manager and foreman of the Glengall company, in which he informed the latter that unless Flood and Taylor were discharged, all the iron workers would be called out, or would knock off work (it was doubtful which expression was used) ; that the Glengall company had no option; that the iron men were doing their best to put an end to the practice of shipwrights doing ironwork, and that wherever Flood and Taylor were employed the iron men would cease work. There was evidence that this was done to punish Flood and Taylor for what they had done in the past. The Glengall company, in fear of this threat being carried out, which, as they knew, would have stopped their business, discharged Flood and Taylor and refused to employ them again.

Upon a trial of the action brought against Allen for the consequent damage, Justice Kennedy ruled that there was no evidence of conspiracy (there were other defendants besides Allen), or of intimidation or coercion on Allen's part, nor any evidence of breach of contract by the Glengall company in discharging Flood and Taylor, they having been engaged on terms that they might be discharged at any time. The jury found a special verdict to the effect that Allen maliciously induced the Glengall company to discharge Flood and Taylor and not to re-engage them, and that each plaintiff had suffered damages. Thereupon judgment was entered for the plaintiffs. This decision was affirmed by the Court of Appeal (Master of Rolls Lord Esher, Lords Justices Lopes and Rigby). Allen appealed to the House of Lords, and the case was argued first before Lord Chancellor Halsbury and Lords Watson, Herschell, Macnaghten, Morris, Shand and Davy. It was reargued before the same lords, with the addition of Lords Ashbourne and James of Hereford, in the presence of eight judges summoned to attend, viz., Hawkins, Matthew, Cave, North, Wills, Grantham, Lawrance and Wright. At the close of the arguments the following question was pro-

pounded by the House of Lords to the judges: "Assuming the evidence given by the plaintiffs' witnesses to be correct, was there any evidence of a cause of action fit to be left to the jury?" The eight judges severally delivered opinions, six of them answering in the affirmative, the other two in the negative. Thereupon the House of Lords, by a vote of six (Watson, Herschell, Macnaghten, Shand, Davy and James, of Hereford) against three (Halsbury, Ashbourne and Morris), reversed the judgment under review. But while those lords who voted to reverse did to some extent attempt to controvert the reasoning of Lord Halsbury and those who agreed with him, it is to be observed that they came to the conclusion reached on the ground that, although there was evidence of a cause of action fit to be left to the jury, they were constrained to ignore the evidence of intimidation on the part of Allen upon the ground that the trial judge had ruled it out of the case.

The decision has been explained, and its effect upon the present case practically overruled, as will be seen presently. But giving to it all the respect that it deserves, its weight as an authority in this jurisdiction depends, of course, upon such respect as the reasoning of the prevailing opinions may command, corroborated, so far as may be, by the weight of numbers. Upon the latter point it is significant that upon the main merits a majority of all the judges of England who considered the case were favorable to a recovery, including the trial judge, Kennedy; the Lords Justices of the Court of Appeal, Esher, Lopes and Rigby; six judges who sat with the lords, viz., Hawkins, Cave, North, Wills, Grantham and Lawrance, and three lords, including the Lord Chancellor (Halsbury, Ashbourne and Morris)—thirteen in all, while on the other side were the judges, Matthew and Wright, and six members of the House of Lords, eight in all.

If we have correctly apprehended the essential grounds upon which proceeded the judgment of the majority of the House of Lords in this case, the decision is not antagonistic to the plaintiff's right of action in the present instance. It seems to have been held that Allen's conduct amounted to

no more than legitimate persuasion; that he violated no legal right of Flood and Taylor; did no unlawful act and used no unlawful means in procuring their dismissal, and that his conduct was therefore not actionable, however malicious or bad his motive might be. Such, indeed, is the abstract of the decision as contained in the syllabus. In the case before us, however, the defendants were not acting within their legal rights, because, as already appears, even if the general object of the defendant association in respect of controlling the hatters' trade in the district covered by their operations be assumed to be lawful, yet their interference with the plaintiff in his occupation, in the manner in which they did interfere, was to be justified only in the event that plaintiff was first duly convicted and sentenced in accordance with the procedure prescribed by the laws of the defendant association, and this had not been done.

No doubt, however, there is much in the reasoning of the lords who voted for reversal in Allen *v.* Flood that, if accepted, would tend to negative a right of action in the present case. Time will not admit of an exhaustive review of that reasoning. We content ourselves with saying that it does not commend itself to us. We cannot agree that no legal right of Flood and Taylor was interfered with, because they had no legal right to insist upon their continued employment with the Glengall company. They were none the less entitled to the reasonable expectation that their employment would continue, and it did not lie in the mouth of one who, without warrant, had interfered with their *status* as employes to say that if he had not done so their employer might have terminated the *status* of his own accord. Nor can we agree that Allen was acting in the exercise of any absolute right. His rights, like all personal rights that are to be enjoyed in a state of society, were qualified to a material extent when they came into conflict with the rights of others. Without reviewing the elaborate opinions, it is sufficient to say that the general course of reasoning of those judges and lords who maintained the right of action is, to our minds, the more satisfactory.

Allen *v.* Flood is practically overruled by the decision of the House of Lords in *Quinn* v. *Leathem* (1901), *A. C.* 495, where it was held that a combination of two or more, without justification or excuse, to injure a man in his trade by enticing his customers or servants to break their contracts with him or not to deal with him or continue in his employment, is actionable if it results in damage to him. And a subsequent decision in the Court of Appeal is to the same effect. *Giblan* v. *National Amalgamated Union* (1903) *2K. B.* 600. These two cases are clear authorities for the present action. The latter case is quite in point. Giblan was a member of the union and was indebted to it in a considerable sum for moneys that had been entrusted to him as treasurer of one of its branches. In order to compel him to pay this money the union, through two of its officers (whose acts were afterwards approved by the union), undertook to prevent, and did prevent, plaintiff from getting or retaining employment, by calling out or threatening to call out the men. It was held that the union and its officers were liable in damages for interfering with Giblan in the exercise of his common law right to dispose of his labor according to his will, and that their action was not justified by the fact that it was taken for the purpose of compelling him to make good his defalcation.

Upon both reason and authority, therefore, we are of the opinion that the acts of the defendants herein, as above recounted, amounted to an unwarranted interference with the plaintiff in his trade as a hatter, and he having sustained damage as a result thereof in losing his place of employment the present action is sustainable.

The judgment under review will be affirmed, with costs.

*For affirmance*—THE CHANCELLOR, CHIEF JUSTICE, GARRISON, FORT, GARRETSON, HENDRICKSON, PITNEY, SWAYZE, REED, BOGERT, VREDENBURGH, VROOM, GRAY, DILL. 14.

*For reversal*—GREEN. 1.