RCA MFG. CO., Inc., v. WHITEMAN et al.

District Court, S. D. New York.

July 24, 1939.

Maurice J. Speiser, of New York City, for defendant Whiteman.

Stuart Sprague, of New York City, amicus curiæ.

Maurice J. Speiser, of New York City, General Counsel for National Association of Performing Artists, amicus curiæ.

LEIBELL, District Judge.

Paul Whiteman, a performing artist and orchestra leader, filed suit in this Court against W. B. O. Broadcasting Corporation, owner and operator of station WNEW, and Elin, Inc., sponsor of the programs which gave rise to this litigation.

Whiteman claiming to be a unique artist and performer in his field as an orchestra conductor, and also, by his peculiar interpretations of musical compositions, a creative musical artist, with a national and international reputation as such, sought an injunction against the defendants, W.B.O. Broadcasting Corporation and Elin, Inc., prohibiting the use for broadcasting purposes of any phonograph record, made and created by the plaintiff and his orchestra. Whiteman based his claim to injunctive relief on the grounds that such indiscriminate and unauthorized use of his records interfered with his common-law property right in and to his musical interpretations and renditions inscribed on said records; hindered his chances of obtaining contracts for the use of his services; forced him to compete with himself; curtailed his income based on royalties from such records; interfered with his agreement with RCA Victor Talking Machine Co.; and that defendants'

actions constituted unfair competition with Whiteman in his various fields of activity.

By order of this Court the RCA Manufacturing Company, Inc., received permission to file a bill of complaint against both Whiteman and said defendants, which would be ancillary to Whiteman's main suit. The permission to file the bill was granted on the grounds that RCA has a deep interest in the litigation and one which was antagonistic to the claim asserted against the defendants by Whiteman. This Court held that RCA also had a grievance against the defendants. The ancillary bill was filed.

The original suit of Whiteman against W. B. O. Broadcasting Corporation and Elin, Inc., was later withdrawn by stipulation and without prejudice. This left only the suit of RCA Manufacturing Company Inc. against Whiteman, W. B. O. Broadcasting Corporation and Elin, Inc., for trial. At the trial defendants, W. B. O. Broadcasting Corporation and Elin, Inc., elected not to put in a defense. Whiteman did defend.

Plaintiff, RCA, in its bill of complaint alleges that the use of its records by others for profit constitutes a wrongful exploitation of its property rights, results in a reduced demand for its records, deprives plaintiff of the services of artists who will not record unless they can be protected against injudicious and excessive repetitions over the radio of their recorded performances, causes a species of unfair competition resulting in damages in that it tends to destroy the saleability of plaintiff's records through constant repetition, and in the case of records manufactured after November 1932 constitutes a breach of contract resulting from violation of a restrictive covenant accompanying the sale of the records and expressed in the legend on the label attached to the records. Furthermore, RCA contends that attempts by defendant Whiteman to license records for broadcasting and public performances, together with representations to the effect that he alone is entitled to grant such license, interferes with complainant's exclusive right to control the use of its records, damages its reputation, goodwill and business, tends to prevent the consummation of licensing agreements by complainant and constitutes unfair competition in that defendant Whiteman attempts thereby to exploit, as his own, property rights belonging to complainant.

Plaintiff, RCA, and its predecessor companies, Victor and RCA Victor, have been engaged generally in the business of manufacturing, producing, recording, selling and distributing Victor phonograph records since October 1901.

Defendant, Paul Whiteman, for the past twenty years has been the conductor of an organization of musicians known as "Paul Whiteman and His Orchestra". His orchestra has played for the motion pictures, on the stage and in night clubs, in addition to broadcasting over the radio and making phonograph recordings.

Defendant, W. B. O. Broadcasting Corporation owns and operates radio station WNEW. It was over this station that the phonograph records listed below were played without permission. All records that were issued after November 1932 by plaintiff and its predecessors, bore a legend stating that such records were not licensed for radio broadcasting. Defendant, Elin, Inc., sells refrigerators and sponsored the programs over station WNEW, which gave rise to this litigation.

The following nine compositions are specifically named in the plaintiff's bill of complaint. They were recorded by Whiteman for RCA's predecessor corporations pursuant to the terms of various contracts, three in number. Their titles are: "San", "O So Blue", "Whiteman Stomp", "By the Sycamore Tree", "You Excite Me", "Cuban Love Song", "There's Nothing Else to Do", "Singing a Happy Song" and "A Waltz was Born in Vienna".

The first three of the above named compositions were recorded by Whiteman under the terms of a written contract, dated April 30, 1924, and covering the period from May 12, 1924, to and including May 11, 1928. Paragraph "3" of this contract recites the rights and privileges Mr. Whiteman granted RCA's predecessor. It is here quoted in full:

"3. Mr. Whiteman, for himself and by authority and on behalf of the Orchestra and each and all of the members thereof, hereby grants to the Victor Company the right, at any and all times during the period of this agreement and thereafter, to manufacture, advertise and license or sell, and any and all these rights and powers, in all parts of the world, records of the performances of the Orchestra of selections of which approved master records have been heretofore made or shall hereafter be made including the right to pro—

duce and reproduce the recorded per-' formances of the Orchestra by any and all mechanical, electrical or other means for disseminating or transmitting the same, and grants the further right to make use of his name and of the name of his Orchestra in connection with the manufacture, with the advertisement and with the license or sale of such records and in any and every way in connection with sound reproduction and transmission and likewise grants all rights and equities of himself and of the Orchestra and of each of its members in and to the matrices and records upon which are at any time reproduced the performances herein referred to."

The next four of the above named selections were recorded under the terms of a verbal agreement referred to in a letter dated September 8, 1931, signed by I. E. Lambert for RCA Victor Co., Inc., and accepted by Mr. Whiteman. The terms of that agreement will be hereinafter discussed; but in effect Whiteman resumed making recordings for RCA's predecessor, on the basis of a fixed royalty instead of a lump sum payment, with no time limit during which the contract was to be in effect, and with the other terms and provisions of his 1924 contract continued.

The last two musical selections were recorded by Mr. Whiteman under the terms of a third contract dated September 5, 1934, covering a period of two years. Paragraph "2" of Provision "2" of this contract deals with the rights granted by Mr. Whiteman to RCA Victor and is here set forth in full:

"You grant to the Company, its associates or subsidiaries, the right to manufacture and sell, or to refrain therefrom, throughout the world, records embodying the performances to be recorded hereunder, upon such terms as the Company may approve, but only such records commonly known as phonograph records of the type now sold to the public for use with talking machines, and not otherwise. It is understood the Company does not acquire the right to manufacture or sell, or otherwise dispose of, records for broadcasting. You grant to the Company the right to use your name and photograph, if desired, in connection with the manufacture, advertising and sale of said records without further payment than herein provided, and likewise grant the Company all rights in and to the matrices and records upon which are reproduced the performances to be made hereunder."

Complainant concedes that defendant Whiteman, because of his unique interpretations of musical selections, had a common law property right in his renditions. Under the first and second contracts of April 30, 1924, and September 8, 1931, Whiteman could not assert these rights, in the case of the former because he had in very definite terms passed all rights to the plaintiff and in the latter instance verbally by a general reaffirmation. In each instance he failed to reserve any rights to himself. But the right was there in each case.

The fact that until recent years the problem of a common law right in musical interpretations and renditions had never been adjudicated is no indication that the common law does not apply. As was stated in the case of Funk v. United States, 290 U.S. 371 at page 383, 54 S.Ct. 212, at page 216, 78 L.Ed. 369: "It has been said so often as to have become axiomatic that the common law is not immutable but flexible, and by its own principles adapts itself to varying conditions."

Prior to the advent of the phonograph, a musical selection once rendered by an artist was lost for ever, as far as that particular rendition was concerned. It could not be captured and played back again by any mechanical contrivance then known. Thus the property right of the artist, pertaining as it did to an intangible musical interpretation, was in no danger of being violated. During all this time the right was always present, yet because of the impossibility of violating it, it was not necessary to assert it.

The fact that Whiteman contributed something in addition to that which was already the subject of a copyright, the musical composition itself, cannot in any way detract from his right to protect what is his property, over and above existing property rights of the composer. Mr. Justice Stern states this proposition in Waring v. WDAS Broadcasting Station, 327 Pa. 433, 194 A. 631, 635, as follows: "The law has never considered it necessary for the establishment of property rights in intellectual or artistic productions that the entire ultimate product should be the work of a single creator; such rights may be acquired by one who perfects the original work or substantially adds to it in some manner."

Granting that the artist, Mr. Whiteman, has a common law property

right in and to his unique interpretation of musical selections it follows that he had the power to bargain away this right. This he did in his 1924 contract with RCA's predecessor. Paragraph "3" of that contract has been quoted above.

■ Defendant Whiteman contends that the word "license" as used in that agreement had a special meaning. Some testimony was taken at the trial to develop if possible the peculiar meaning claimed for the word "license", in this business of making and merchandising phonograph records. The burden of proving a "trade usage" meaning of an apparently common word, which would limit its generally accepted meaning is upon the one who contends for the more limited meaning. I have concluded that the defendant Whiteman has not successfully borne this burden.

The limited meaning which defendant Whiteman would place upon the word "license", that it refers to RCA's transactions with foreign subsidiaries or related companies, is further refuted by the following quotation from his contract: "* * * and likewise grants all rights and equities of himself and of the Orchestra and of each of its members in and to the matrices and records upon which are at any time reproduced the performances herein referred to".

■ Whiteman's second contract with RCA's predecessor was a verbal one. It is referred to in a letter dated September 8, 1931, signed by I. E. Lambert for RCA Victor Co., Inc., and accepted by Mr. Whiteman. The letter sets forth only the new financial arrangement between the parties. From the testimony it would appear that the other terms of his 1924 agreement were reaffirmed by the parties.

In the absence of any reservation by Whiteman of his common law property rights, all his rights therein passed to the complainant. Ingram v. Bowers, 2 Cir., 57 F.2d 65; Noble v. One Sixty Commonwealth Ave., Inc., D.C., 19 F.Supp. 671.

■ In paragraph 2 of Section 2 of Whiteman's third contract, dated September 5, 1934, made with RCA's predecessor, it is provided: "It is understood the Company does not acquire the right to manufacture or sell, or otherwise dispose of, records for broadcasting." This definitely reserved to Whiteman his common law property right in and to his musical interpretations and renditions in respect to the broadcasting of records made under this contract. Complainant concedes this.

■ One of the most controverted issues was whether or not the part played by RCA Victor Company in the recording of Whiteman's interpretation and renditions constituted such intellectual and artistic contributions as to vest in RCA a common law property right in what went on the record. I am of the opinion that it did not.

RCA's predecessors contributed to the finished product (the master matrix) the fruits of their research and experience in the production and manufacture of phonograph records, and the skillful use of a highly sensitive mechanism. Their musical directors advised on the placing of the musicians during the recording and on the volume of the various musical instruments; their acoustic experts arranged their appliances to produce a clear and well balanced rendition; their engineers and technicians operated the mechanical devices in the actual recording on the matrix. All these were important and necessary in producing a perfect recording of the performance, but the performance was Whiteman's.

None of the efforts of RCA were directed towards perfecting Whiteman's artistic interpretation of the musical composition, but all were directed towards "capturing" completely for the matrix or master record his unique interpretations. The well known manufacturers of phonograph records use the same apparatus and methods. The average person could not tell by listening to the finished record which company made the record or which musical director supervised its recording or who manipulated the dials, arranged the microphones or handled the other mechanical devices used in getting the physical recording. But many of the public can recognize Whiteman's peculiar interpretation of certain popular musical recordings.

■ Another question presented is whether or not the sale of a Whiteman record, without any restrictive notice, would give the purchaser of the record the right to broadcast its contents over the radio, without special authorization to do so. I think it would not, for several reasons, principally because it would constitute unfair competition.

■ It is well settled that the performance of a work is not of necessity a

publication of it. "At common law, the public performance of the play is not an abandonment of it to the public use." Ferris v. Frohman, 223 U.S. 424, 32 S.Ct. 263, 266, 56 L.Ed. 492. Publication may be either "general" or "limited". The distinction between the two is well explained in the leading case of Werckmeister v. American Lithographic Co., 2 Cir., 134 F. 321, 68 L.R.A. 591. See, also, American Tobacco Co. v. Werckmeister, 207 U.S. 284, 28 S.Ct. 72, 52 L.Ed. 208, 12 Ann.Cas. 595.

There is some basis for the argument that the purchaser of a Whiteman record, even without a restrictive notice appearing on the label attached to the record, would gain only the right to use it for the purpose for which it was made, that is to reproduce its contents through the use of a phonograph, which would not carry with it the right to broadcast the contents of the record over the radio. The very nature of the phonograph record indicates the limited form of its publication. It was intended for listeners at a phonograph, not for a radio audience.

The phonograph records made by RCA in November 1932, and subsequently, bore a special label notifying the purchaser that it was "Not Licensed for Radio Broadcast". Of itself the notice was sufficient to "limit" the publication of the records, and on that ground also an injunction could issue against the broadcasting of all records bearing said legend, unless the restriction is against public policy.

There does not appear to be any public policy to be found in the constitution, the statutes or the decisions of our courts that would affect this limited-use notice, unless such limitation is an unreasonable restraint of trade, which it is not. It is a restriction to protect complainant from unfair competition. There is nothing illegal about it. The interests of the public are not harmed by the restricted use of the phonograph record. Broadcasting stations can give their public Whiteman's orchestra, by hiring the orchestra at a proper price, as some of them do. To hold that the equitable servitude embodied in the label-notice, prohibiting the use of the record for broadcasting, is against public policy, would make the principal beneficiaries of this judicial bounty those who in broadcasting such record seek to "harvest the fruits of another's labor", at practically no cost to themselves.

I think that the main basis for enjoining the defendants, W. B. O. Broadcasting Corporation and Elin, Inc., from sending over the radio the musical renditions impressed on complainant's phonograph records, is that such conduct on their part constitutes unfair competition. It is evident that the complainant and the broadcasting stations using complainant's records are competitors in the business of public entertainment.

As was stated by Mr. Justice Pitney in International News Service v. Associated Press, 248 U.S. 215, 234, 39 S. Ct. 68, 71, 63 L.Ed. 211, 2 A.L.R. 293: "We need spend no time, however, upon the general question of property in news matter at common law, or the application of the copyright act, since it seems to us the case must turn upon the question of unfair competition in business."

The Justice then went on to discuss unfair, competition and the proper rights protected from unfair competition. He wrote (248 U.S. at pages 235, 236, 240, 39 S.Ct. at page 71, 63 L.Ed. 211, 2 A.L.R. 293):

"The parties are competitors in this field; and, on fundamental principles, applicable here as elsewhere, when the rights or privileges of the one are liable to conflict with those of the other, each party is under a duty so to conduct its own business as not unnecessarily or unfairly to injure that of the other. Hitchman Coal & Coke Co. v. Mitchell, 245 U.S. 229, 254, 38 S.Ct. 65, 62 L.Ed. 260 [277], L.R.A.1918C, 497, Ann.Cas.1918B, 461.

"* * * Regarding the news, therefore, as but the material out of which both parties are seeking to make profits at the same time and in the same field, we hardly can fail to recognize that for this purpose, and as between them, it must be regarded as quasi property, irrespective of the rights of either as against the public.

"In order to sustain the jurisdiction of equity over the controversy, we need not affirm any general and absolute property in the news as such. The rule that a court of equity concerns itself only in the protection of property rights treats any civil right of a pecuniary nature as a property right (In re Sawyer, 124 U.S. 200, 210, 8 S.Ct. 482, 31 L.Ed. 402 [405]; In re Debs, 158 U.S. 564, 593, 15 S.Ct. 900, 39 L.Ed. 1092 [1105]); and the right to acquire property by honest labor or the conduct of a lawful business is as much entitled to protection as the right to guard

property already acquired (Truax v. Raich, 239 U.S. 33, 37-38, 36 S.Ct. 7, 60 L.Ed. 131 [133, 134], L.R.A.1916D, 545, Ann.Cas. 1917B, 283; Brennan v. United Hatters, 73 N.J.L. 729, 742, 65 A. 165, 9 L.R.A.,N.S., 254, 118 Am.St.Rep. 727, 9 Ann.Cas. 698; Barr v. Essex Trades Council, 53 N.J.Eq. 101, 30 A. 881). It is this right that furnishes the basis of the jurisdiction in the ordinary case of unfair competition. * * *

"But in a court of equity, where the question is one of unfair competition, if that which complainant has acquired fairly at substantial cost may be sold fairly at substantial profit, a competitor who is misappropriating it for the purpose of disposing of it to his own profit and to the disadvantage of complainant cannot be heard to say that it is too fugitive or evanescent to be regarded as property. It has all the attributes of property necessary for determining that a misappropriation of it by a competitor is unfair competition because contrary to good conscience."

The reasoning and legal principles quoted above would bar Whiteman, acting alone, from licensing or authorizing any broadcasting station to play over the radio a phonograph record made by complainant. That is true even though Whiteman, as in his third contract, included a provision that the complainant did not acquire the right to manufacture or sell, or otherwise dispose of, records for broadcasting. The plaintiff would be entitled to protection of its "civil right of a pecuniary nature", its "conduct of a lawful business" against unfair competition, unless complainant expressly assents to competition from radio stations using complainant's phonograph records. In bringing this action complainant seeks to stop that practice and is entitled to the aid of the Court by a proper decree enjoining the defendants accordingly.

That the broadcasting of phonograph records, containing Whiteman's renditions, constitutes unfair competition with Whiteman is manifest. Hence the defendants, W. B. O. Broadcasting Corporation and Elin, Inc., should be enjoined to protect Whiteman's interests also. The above quoted principles on unfair competition, so convincingly expressed by Mr. Justice Pitney, are available for Whiteman's protection as well as for complainant's.

Complainant and the defendant Whiteman have submitted proposed findings of fact and conclusions of law. The court has heard argument in respect thereof and has recast many of them. They have been re-arranged and in final form have been signed and filed. I am now filing this memorandum, which states my reasons for reaching the conclusions aforesaid. A final decree is being entered in accordance with the conclusions of law heretofore filed.