275 F.2d 220
 Joseph F. WALSH, Trustee of the Estate of Frank Dailey's Meadowbrook, Inc., Bankrupt, Plaintiff-Appellant,
v.
RADIO CORPORATION OF AMERICA and Helen D. Miller as Executrix of the Estate of Alton Glenn Miller, also known as Glenn Miller, Deceased, Defendants-Appellees.
 No. 157.
 Docket 25751.
 United States Court of Appeals Second Circuit.
 Argued January 14, 1960.
 Decided March 2, 1960.
 
 Frank Weinstein, New York City (Weinstein & Levinson, New York City, on the brief), for plaintiff-appellant.
 Alice B. Gilbert, New York City (Cahill, Gordon, Reindel & Ohl, New York City, on the brief), for defendant-appellee Radio Corporation of America.
 David Mackay, New York City, for defendant-appellee Helen D. Miller, Executrix.
 Before CLARK, HINCKS and WATERMAN, Circuit Judges.
 HINCKS, Circuit Judge.
 
 
 1
 In 1939, Glenn Miller, the orchestra leader and arranger, who had not yet reached the widespread popularity which he later attained, played two series of performances with his orchestra at Frank Dailey's Meadowbrook, Inc., a New Jersey night club, of which the plaintiff below is the trustee in bankruptcy. The contract for the later series as signed by the parties was evidenced by a printed form, designated on its face as A. F. of M. No. 300, containing a clause providing: "It is specifically understood and agreed that unless otherwise specified herein, no part of the performances of the attractions shall be broadcast or reproduced by radio or other means." (Hereinafter, we shall refer to this as the reproduction clause.) The contract also contained the printed sentence: "The musicians engaged herein being members of the American Federation of Musicians, it is agreed that all the laws, rules and regulations of the American Federation of Musicians are a part of this agreement." The contract was in a form approved and required by the Musicians Union. Typed upon the face of the contract was a notation that "Frank Dailey's Meadowbrook is to assume charges for one WOR Broadcasting line." There was insufficient evidence to establish the terms of the contract for the earlier series of performances, but for purposes of this opinion we will assume that it was the same as that just described.
 
 
 2
 The National Broadcasting Company (NBC), a wholly owned subsidiary of the defendant Radio Corporation of America (RCA), and also WOR, another broadcasting station, broadcasted some of these performances from the night club and, as a matter of standard operating procedure, made "off-the-line"[1] recordings of some of these broadcasts. The bankrupt at the time knew that NBC as well as WOR had wires and other broadcasting equipment in the night club and were broadcasting the performances as coming from Meadowbrook. Indeed, the bankrupt made payments to NBC in the course of the broadcasting, but the evidence failed to show whether the payments covered charges for broadcasting the music or for mention of the night club. Beyond question, at least before the series of performances had been concluded the bankrupt had consented to the broadcasting, notwithstanding the terms of the contract. But its knowledge of NBC's off-the-line tapes was not established. However, off-the-air tapes of the performances were recorded by Miller. This, the bankrupt knew and consented to.
 
 
 3
 In the early 1950's and thereafter, Glenn Miller's executrix, the other defendant herein, through a series of contracts, granted RCA the exclusive right to manufacture and sell phonograph records reproducing Miller's musical performances in exchange for royalty considerations. The subject-matter of this action is an album entitled "Glenn Miller and His Orchestra, Limited Editions, Volume Two," which was released for public sale by RCA in 1954. The album contains sixty of Miller's performances at various night clubs, twelve of which are re-recordings of NBC's off-the-line tapes of Miller's Meadowbrook performances. A large number of these albums have since been sold. But neither the bankrupt nor its trustee, the plaintiff, has ever received any remuneration therefor.
 
 
 4
 The plaintiff by his complaint[2] sought an accounting of the defendants' gains realized from the sales of this album or, in the alternative, damages. Upon trial before Judge Clancy without a jury, the judge at the conclusion of plaintiff's case dismissed the complaint making findings of fact and conclusions of law (unreported).
 
 
 5
 The plaintiff's arguments for reversal are threefold, and can be briefly stated. First, he contends that the effect of the clause in the contract quoted above was to subject both parties to a negative covenant which meant, under a fair interpretation, that upon a breach by one party by reproducing the broadcasts or records, the other party would be entitled to at least half of the resulting profits. Second, it is argued that subject to the negative covenant Miller's common law performer's rights in his performances passed to the plaintiff, because of Miller's failure to expressly reserve them in the contracts. Finally, it is contended that the bankrupt, by reason of the expenses it incurred in presenting Miller's performances,[3] obtained Miller's common law rights by operation of law and that, in any event, a court of equity should prevent the misappropriation of the bankrupt's investment, which went into the performances.
 
 
 6
 The tenor of these contentions makes it plain that the disposition of this case depends upon the interpretation of the contract. We, therefore, turn directly to that problem.
 
 
 7
 It will be noted at the outset that the reproduction clause of the contracts, even if viewed as a negative covenant, has no self-contained provision for its termination. It does not follow, however, that the parties intended, or that the contract should be interpreted to mean, that the clause should remain in effect in perpetuity. It is far more reasonable to infer an intent that the prohibition against reproduction at most should be limited to the specific term provided for the main affirmative performance bargained for.
 
 
 8
 But even if, contrary to our ruling, the clause could properly be construed to have any legal effect[4] subsequent to the complete performance of the affirmative provisions of the contract, it does not follow that the appellant is right in his insistence that the contract should be interpreted as intended or effective to transfer or assign Miller's exclusive common law right to make recordings of his live performances. Certainly the contract is devoid of express language to that effect. We fail to see how the "reproduction" clause lends support to the appellant's position. If that clause did not expire when the last performance contracted for expired — if thereafter, Miller was under obligation by virtue of the reproduction clause not to make reproductions — so was Meadowbrook. It is nonsense to say that the contract assigned the right to reproduce to Meadowbrook if the contract imposes an obligation on Meadowbrook not to reproduce the performances. Nor was there anything in the situation of the parties to indicate that such a transfer was intended.[5] There was no evidence that Meadowbrook in connection with its night club activities had ever before reproduced the live performances for which it had contracted either for use in its own establishment or for sale to others. The contract was silent as to any royalty rights or accounting obligations. And the conduct of the parties both as performance of the contract proceeded and after it was completed provides eloquent argument against such a thesis.[6] The evidence makes it abundantly clear, as the judge found, that the bankrupt knew throughout that Miller was making off-the-air tapes of his Meadowbrook performances. Its acquiescence in this procedure and its failure ever to demand surrender of the tapes or to call Miller to timely accounting for reproductions indicate that the bankrupt had no intent to obtain an exclusive right to reproduce. The broadcasts were consented to, it may be inferred, by the night club because of the publicity which they gave it. They were desired by Miller for the publicity it gave him and his music. It seems clear that the night club was entirely without interest in the reproduction of the music apart from any accompanying mention of itself. We conclude that under the contract properly interpreted the night club acquired nothing more than the right to the stipulated live performances. Cf. Uproar Co. v. National Broadcasting Co., 1 Cir., 81 F.2d 373, certiorari denied 298 U.S. 670, 56 S.Ct. 835, 80 L.Ed. 1393; 18 C.J.S. Copyright and Literary Property § 12c (2), p. 149.
 
 
 9
 The appellant, apparently by way of supposed analogy, invokes the rule that the sale of subject-matter protected by statutory or common law copyright, in the absence of express reservation by the vendor, is deemed to carry with it all the vendor's common law right. But such a rule would scarcely seem to help the appellant. For in this contract the reproduction clause makes it plain that the contract did not carry with it the right to reproduce: in effect it was tantamount to a reservation of recording rights to Miller. Surely such a rule would be inapplicable when, as here, the evidence reasonably required a finding that no such transfer was intended.
 
 
 10
 On this point, we find nothing contrary in the cases advanced by the plaintiff. In RCA Mfg. Co. v. Whiteman, D. C., 28 F.Supp. 787, reversed on other grounds 2 Cir., 114 F.2d 86, there was convincing evidence that the performer definitely intended to transfer to a recording company his common law rights in his unique interpretations of musical selections, for the purpose of allowing that company to produce and sell recordings of such performances. Here, of course, the transaction was one between a performer — a creative artist — and a night club which had no thought or desire to go into the recording business. Pushman v. New York Graphic Soc., Inc., 287 N.Y. 302, 39 N.E.2d 249, was a case in which it was held that an artist by the sale of his painting under an ordinary unconditional straight bill of sale intended to convey his whole interest in his picture. And in Chamberlain v. Feldman, 300 N.Y. 135, 89 N.E.2d 863, it was held that the passing of a common law copyright depended on intention — not on a rigid presumption. More pertinent than such cases to the situation here is Manners v. Morosco, 252 U.S. 317, 40 S.Ct. 335, 64 L.Ed. 590. There a contract which granted "the sole and exclusive license and liberty to produce, perform * * *" a play was held not to carry with it moving picture rights. Cf. Ettore v. Philco Television Broadcasting Corp., 3 Cir., 229 F.2d 481, 58 A.L.R.2d 626; Harper Bros. v. Klaw, D.C., 232 F. 609, 613.
 
 
 11
 If we are right in holding that Meadowbrook did not, under the contract, acquire Miller's recording rights, it is plain that it is not entitled to recover under its claim of misappropriation. The facts here are far removed from those which shaped the decision in International News Service v. Associated Press, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211, and the other cases on which the appellant relies. The expenses and services which Meadowbrook contributed in connection with the live performances had no relation whatever to an exercise of the recording rights ten years later. They added nothing distinctive to the musical or artistic quality of the performances — still less to the quality or fidelity of the reproduction. There was no showing that the acts complained of deceived the public, deprived Meadowbrook of any property or injured it in any way. No case is cited which goes so far as to suggest that a dance hall proprietor has property rights in recordings made from performances at his place of business.
 
 
 12
 Affirmed.
 
 
 
 Notes:
 
 
 [1]
 An "off-the-line" recording is a tape recording made by a broadcasting company of sound carried over its own wires in the course of its broadcast
 
 
 [2]
 The action was originally brought in the Supreme Court of New York in January 1956 from which it was removed to the court below
 
 
 [3]
 In addition to Miller's fee, the bankrupt paid some advertising expenses. Also a portion of the bankrupt's fixed annual payment to the American Society of Composers, Authors and Publishers (ASCAP) for the privilege of having performed at Meadowbrook numerous musical selections, among which the twelve songs in question might fairly be apportioned, it is claimed, against the Miller contract
 
 
 [4]
 Whatever itslegal effect may have been, under the facts in evidence Meadowbrook could not possibly have been injured by the conduct complained of, as we point out in the last paragraph of this opinion. Kirke La Shelle Co. v. Paul Armstrong Co., 263 N.Y. 79, 188 N.E. 163.
 
 
 [5]
 3 Corbin on Contracts §§ 535, 542, 545
 
 
 [6]
 3 Corbin on Contracts § 558