**FLEMING SALES COMPANY,
INC., Plaintiff,
v.
Joseph W. BAILEY and Unlimited
Sales of America, Inc.,
Defendants.**

No. 84 C 7028.

United States District Court,
N.D. Illinois, E.D.

May 24, 1985.

Eugene Friedman, Chicago, Ill., for plaintiff.

Thomas B. McNeill, Fern C. Bomchill, Lynne M. Raimondo, Locke E. Bowman, Mayer, Brown & Platt, Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Fleming Sales Company, Inc. ("Fleming") has filed a five-count Verified Complaint (the "Complaint") against Joseph Bailey ("Bailey") and Unlimited Sales of America, Inc. ("Unlimited"). Fleming charges Bailey (1) misappropriated Fleming's trade secrets, (2) interfered with Fleming's contractual relations, (3) slandered Fleming, (4) breached his fiduciary duty to Fleming and (5) unfairly competed against Fleming. Unlimited is alleged to be the vehicle through which Bailey engaged in some or all of that activity.

Defendants have now moved under Fed. R.Civ.P. ("Rule") 56 for summary judgment on Complaint Counts I and III, the trade secrets and slander claims. In addition defendants assert those claims are neither "well grounded in fact" nor "warrant-

ed by existing law or a good faith argument for the extension, modification or reversal of existing law." Accordingly they seek to recover their expenses on the Rule 56 motion in the form of sanctions imposed on Fleming under Rule 11. For the reasons stated in this memorandum opinion and order defendants' motion for a summary judgment as to Counts I and III is granted. Defendants' Rule 11 motion is granted to a limited extent but denied in principal part.

### Facts [1]

Fleming, a family-owned manufacturers' representative business, has an original equipment manufacturers ("OEM") division headquartered in Elkhart, Indiana. Through its OEM division, Fleming is engaged by recreational vehicle ("RV") component manufacturers ("Fleming's principals") to market their products to RV manufacturers ("Fleming's customers"). Bailey was hired as a salesman in the OEM division in March 1977. In July 1980 Bailey was made General Manager of the OEM division, and in August 1983 he was placed on the Fleming Board of Directors. In the meantime he had turned the OEM division into a substantially better business operation for Fleming.

Despite Bailey's relatively rapid rise at Fleming, he had for some time been dissatisfied over what he perceived as his limited freedom to run the OEM division without oversight by Fleming management (he had been promised a "free hand" in that respect) and his limited future prospects in its family-owned structure. On April 27, 1984 Bailey wrote to Fleming Board Chairman Jack Grady ("Grady") explaining his dissatisfactions and announcing his decision to resign from Fleming and the Board of Directors effective May 1, 1984 (Bailey Aff.Ex.). In fact Bailey continued as OEM division head until May 18 and continued to receive his salary and benefits until the end of May (Bailey Dep. 84–87). Bailey had entered into no written employment contract with Fleming, nor had he signed a restrictive covenant of any kind in Fleming's favor.

In late 1983, several months before his resignation from Fleming, Bailey joined with James Clipp ("Clipp") to form Unlimited for the manufacture of a rigid blind product to be sold as an accessory for RVs. Though formed in January 1984 Unlimited did not begin substantial operations before June 1984. It has yet to begin manufacture of the rigid blind product.

In late June Bailey and Clipp formed a second company, Unified Sales of America, Inc. ("Unified"), to compete with Fleming's OEM division in the representation of RV component manufacturers. Bailey hired several Fleming salesmen to work with him at Unified and began to develop Unified's business with Fleming's principals and customers. Soon thereafter (in August 1984) Fleming initiated this lawsuit.

### Trade Secrets Claim

Fleming contends Bailey has misappropriated several kinds of information, learned in the course of his employment and protectible as trade secrets, that he is now using to compete with the OEM division:

(1) the names and addresses of Fleming's customers;

(2) other information about customers, including the names of contact people and the customers' prior purchasing and payment histories, projected needs and buying procedures; and

(3) information as to Fleming's principals and other sources of supply, including the terms of principals' contracts with Fleming.

Defendants argue none of that information properly qualifies as a trade secret as a matter of law.

---

**1.** Rule 56 principles impose on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). This section states matters in conformity with the principles just outlined. To the extent either party seeks to controvert the facts as so stated, the later text discussion deals with their respective contentions.

■ Before this opinion turns to the merits of Fleming's trade secrets claim, it must deal with a threshold question: whether Illinois' or Indiana's trade secrets law supplies the applicable substantive rule. Of course under *Klaxon Corp. v. Stentor Electric Manufacturing Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941) this Court must look to Illinois conflict-of-law rules. Since *Ingersoll v. Klein,* 46 Ill.2d 42, 48, 262 N.E.2d 593, 596 (1970), Illinois has used the "most significant contacts" approach in torts cases. Applying the *Ingersoll* rule in the trade secrets context, the Illinois Appellate Court has concluded (*Mergenthaler Linotype Co. v. Leonard Storch Enterprises, Inc.,* 66 Ill.App.3d 789, 803, 23 Ill.Dec. 352, 363, 383 N.E.2d 1379, 1390 (1st Dist.1978), confirming Illinois' adoption of the position taken in the *Restatement (Second) of Conflict of Laws 2d* (1971) and quoting this passage from *Restatement* § 145 comment f):

> [T]he principal location of the defendant's conduct is the contact that will usually be given the greatest weight in determining the state whose local law determines the rights and liabilities that arise from false advertising and the misappropriation of trade values.

Not surprisingly, Fleming and defendants agree Indiana law should supply the substantive rule. Bailey's operational site since resigning from Fleming has been Elkhart, Indiana. Both Unlimited and Unified [2] are Indiana operations with their principal bases of operations in Elkhart.

And because Bailey has entered into competition with Fleming's Elkhart-headquartered OEM division, the harm to Fleming of any misappropriation of trade secrets is focused in Indiana. Accordingly this Court will look to Indiana trade secrets law.[3]

In 1982 Indiana adopted the Uniform Trade Secrets Act, Ind.Code §§ 24–2–3–1 to 24–2–3–8 (the "Act"), which authorizes injunctive relief, damages and recovery for unjust enrichment in trade secret misappropriation cases. Where the misappropriation was willful and malicious, the Act also allows an award of exemplary damages. Section 2 defines the Act's operative terms:

> "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

> "Misappropriation" means:

> (1) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or

> (2) disclosure or use of a trade secret of another without express or implied consent by a person who:

> (A) used improper means to acquire knowledge of the trade secret;

> (B) at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was:

> (i) derived from or through a person who had utilized improper means to acquire it;

---

**2.** From the nature of the two Bailey companies' businesses, it appears Unified and not Unlimited is the competitor Fleming is really complaining about (though Fleming did not know that when it filed suit). This opinion should be read as extending to all the competitive activity by whomever it was conducted.

**3.** Defendants also suggest the trade secrets laws of Indiana and Illinois are in full agreement, at least as to the questions in issue on the present motion. Defendants urge that renders any distinction between Indiana law and Illinois law at best an "apparent" conflict, so this Court need not choose between them. See *In re Air Crash Near Chicago, Illinois on May 25, 1979,* 644 F.2d 594, 605 (7th Cir.1981). That argument reflects an imperfect understanding of the distinction

between "true" and "false" conflicts introduced by the late Brainerd Currie as part of his proposed governmental-interest-analysis approach to conflicts problems. See E. Scoles & P. Hays, *Conflict of Laws* 565–73, 603–04 (1982). And in any event, as the text indicates, Illinois does not employ governmental interest analysis in tort cases. As already shown, its most-significant-contacts analysis (derived from the *Restatement*) points directly to Indiana law. Defendants do appear to be right, though, about the substantial similarity between Indiana and Illinois trade secrets law. Because Illinois' law of trade secrets is more extensive than Indiana's, this opinion will therefore look to Illinois law for guidance in instances where Indiana provides no definitive answer.

(ii) acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

(iii) derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

(C) before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

"Person" means a natural person, corporation, business trust, estate, trust, partnership, association, joint venture, government, governmental subdivision or agency, or any other legal or commercial entity.

"Trade secret" means information, including a formula, pattern, compilation, program, device, method, technique, or process, that:

(1) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and

(2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

What the parties' dispute really boils down to is whether or not the items of information defendants allegedly misappropriated qualify as "trade secrets" under the Act. If they do not, Fleming has no action against defendants for their use of the information, for Fleming did not elect to bind Bailey by a restrictive covenant of any kind. See *Steenhoven v. College Life Insurance Co. of America,* 460 N.E.2d 973, 975 n. 7 (Ind.App.1984).

After extensive discovery defendants assert there is no reasonable predicate for inferring the information (1) derives independent economic value by virtue of its confidentiality or (2) was the subject of efforts reasonably calculated to maintain its secrecy. Defendants contend each item

of information was rather (1) general business knowledge bred of experience (and consequently lacking "independent economic value") or (2) information "readily ascertainable by proper means" or (3) both. In addition defendants say Fleming did not make reasonable efforts to maintain the secrecy of the information. Fleming retorts genuine fact issues exist as to each of those contentions.

■ This opinion will consider the parties' arguments as to each item of information in turn, but it is first worth taking a step backward to gain a perspective that might otherwise get lost in the welter of citations to cases, affidavits and depositions the parties have set out against one another. Trade secrets law in general and the Act in particular were never intended "to act as a blanket *post facto* restraint on trade." *Steenhoven,* 460 N.E.2d at 975 n. 7. Thus the identity of a business' customers is no doubt a legitimate business interest protectible by a restrictive covenant (see *American Hardware Mutual Insurance Co. v. Moran,* 545 F.Supp. 192, 195–96 (N.D.Ill.1982), *aff'd,* 705 F.2d 219 (7th Cir.1983)), and the same may perhaps be true of other knowledge a company has amassed simply by virtue of having been in a particular line of business for a long period of time. But that right to impose contractual restraints does *not* render the same knowledge "trade secrets" in the absence of such restraints. Knowledge derived from experience does not automatically carry with it the ability to forestall others who have shared that experience (and thus that knowledge).

■ In other words, a court called on to define boundaries in this area must take care to strike a balance between (1) the underlying purposes of trade secrets law (to maintain standards of commercial ethics and to encourage research and innovation, see M. Jager, *1982 Trade Secrets Law Handbook* §§ 1.01–1.02) and (2) the equally strong policy against inhibiting competition

in the marketplace.[4] Analysis of Fleming's claims discloses it has sought to stifle legitimate competition rather than to resist unwarranted encroachment on its property rights.

### 1. Customer Lists

■ Fleming says Bailey, through his employment as general manager of its OEM division, had access to a comprehensive list of Fleming's customers. While there is no allegation—and no evidence—Bailey took a copy of the list with him when he left his employment,[5] Fleming does assert he took with him knowledge of the customers' names—knowledge he later used to compete (unfairly) against Fleming. Defendants do not deny Bailey came away from Fleming with a knowledge of who its customers were, but defendants argue (1) Fleming did not exert reasonable efforts to maintain the secrecy of that information and (2) the information was readily ascertainable by other means.

Fleming has offered affidavit and deposition evidence indicating a policy of maintaining the confidentiality of the customer list and virtually all other business information. Grady Aff. ¶ 11 says he "has given directions and established the policy that as much information as possible of Fleming is to remain confidential." Each Fleming employee received a "Rules and Regulations" letter specifying as one basis for termination "[c]ommunication or action detrimental to Fleming Sales Company, including but not limited to, exposing confidential information" (Grady Aff.Ex. A). As for customers' identity in particular, Fleming has tendered a showing its complete list of customers was available to only a few top Fleming employees, though OEM division salesmen and office personnel had access to lists identifying all of Fleming's Elkhart customers and some, but not all of, its customers outside Indiana.

Fleming claims no other employee had access to the list.

Defendants acknowledge there is at least a fact issue as to how widely the customer lists were distributed within Fleming. Defendants point out, however, (1) account lists were provided to Fleming's *principals* from time to time and (2) Fleming has no written policy and no clearly articulated procedures to ensure the confidentiality of the customer lists. For example the lists are not kept under lock and key or marked "confidential," and salesmen routinely keep copies in their offices. Moreover customer list information necessarily appeared on shipping documents stored in Fleming's warehouses.

Of course the absence of specific confidentiality procedures (whether written or unwritten) does not itself negate the existence of "reasonable" efforts to maintain secrecy—all the Act requires. Fleming's OEM division was, after all, a *sales* organization. Constant dealings with its customers—whether by phone, letter or in person—was the essence of the business. Naturally Fleming employees whose business it was to maintain that contact needed ready access to customer information. By the same token, distribution of account list information to principals or on occasion to other customers may well have been necessary to the pursuit of Fleming's business. Fleming was plainly not required to shoot itself in the foot to meet the "reasonable efforts" requirement of the Act. So long as Fleming scrupulously limited distribution of customer list information to employees and outsiders whose access was necessary to Fleming's successful pursuit of its business, it must be deemed to have satisfied the "reasonable efforts" requirement, particularly if those given access to the information were also advised to preserve its confidentiality, as Fleming indicates

---

**4.** Fleming Surreply Mem. 6 is simply wrong in contending the distinction between "confidential information" and "trade secrets" is purely "semantic."

**5.** In fact Bailey swears (Aff. ¶ 7):

> In connection with my resignation and leaving Fleming I did not take with me any Fleming business records.

Fleming offers no affirmative evidence to the contrary, with one exception discussed later in this opinion.

they were (Grady Aff. ¶¶ 13, 16).[6] Were that the critical issue, the factual dispute as to Fleming's efforts in that regard (a dispute defendants acknowledge) would compel denial of defendants' motion.

But there is more to the story. All the efforts in the world to preserve confidentiality of information will not suffice if the information is not secret in the first place—if it is "readily ascertainable" by other proper means. Defendants point to several pieces of evidence demonstrating the customer list information could be procured by such other means:

1. Grady stated that as a rule Fleming's principals know "the customers purchasing its products, the amount of product purchased, and the prices paid for those products" (Grady Aff. ¶ 21).

2. Many of Fleming's customers are listed either in telephone directory Yellow Pages or in the trade publication *RV Business.*

3. Others in the business testified (a) competing sales companies generally know who each other's customers are (Kenneth Lail Dep. 225) and (b) it is generally easy for a principal's competitor to find out who that principal's customers are (Roger Smith Dep. 54).

Fleming counters only by arguing defendants are unlikely to be able to reproduce Fleming's customer list from those sources. Not all principals will necessarily be willing to identify their existing customers to new sales companies. Similarly *RV Business* and the Yellow Pages list only a relatively small proportion of the custom-ers on Fleming's list. So, too, a general knowledge of a competitor's customers is something significantly less than access to the customer list itself.

Those assertions may perhaps create a factual issue as to defendants' ability to reproduce the entire customer list precisely from other sources. But what Rule 56 requires is a "material" (that is, outcome-determinative) factual issue. Here it is undisputed that substantial information as to the identity of Fleming's customers is available from other sources. And Fleming has come forward with no evidence at all showing defendants have sought to pursue customers they would not have discovered even without Bailey's exposure to the Fleming list.[7] Especially in a market where customers did business with more than one sales company or were open to the possibility of shifting business from one company to another (see Magee Dep. 93, Grady April 2, 1985 Aff. ¶ 5), it is simply unreasonable to construe the Act's "readily ascertainable" standard as requiring exact duplication of the information on the customer list. See *Steenhoven,* 460 N.E.2d at 974 n. 5.

One other aspect of the problem bears mentioning—an aspect that bears not only on the customer-list issue but on each of the other claimed "trade secrets" categories. Fleming Mem. 5 (emphasis in original) urges "Bailey alone could not have taken Fleming's principals from it; he had to have the help of *Fleming*'s salesmen."[8] But absent some independent tort (such as actionable interference with advantageous

---

**6.** No matter how scrupulous Fleming may have been in handling the customer lists, they might nevertheless not qualify as trade secrets if the demands of Fleming's business required so broad a distribution (either inside or outside the company) as to make it impossible as a practical matter to maintain confidentiality. That question need not be resolved in light of the text analysis.

**7.** Eli Magee, an individual with wide experience in the RV business, testified (Dep. 91) that even customer companies new to the business become generally known in the industry within six months to a year via advertising and exhibitions at trade shows.

**8.** Fleming Mem. 15–16 says in a pejorative tone:

In fact, Defendant Bailey has assigned Fleming's former salesmen to exactly the same territories they had previously covered for Fleming. In Indiana, this means the exact same customers as they previously have visited as Fleming salesmen (Bailey Dep., pgs. 56 to 57, 90 to 100). In particular, they are now soliciting Fleming's customers for Fleming's former principal Vernco (Bailey Dep., pg. 473).

And see Fleming Mem. 22 and 25.

relationships) or extraordinary circumstances (such as in the unique factual matrix of *Duane Jones v. Burke,* 306 N.Y. 172, 117 N.E.2d 237 (1954)), it is perfectly permissible to build an organization by hiring a competitor's personnel. And if the consequence is that the individual employees' knowledge of pieces of the competitor's business is aggregated to provide a more comprehensive view of the total picture, that too can legitimately serve as the source of "readily ascertainable" information in the sense of the Act. Even the proverbial six blind men, if they pooled their information, might well produce a reasonably good description of the elephant.

Thus no genuine issue of *material* fact exists as to the availability of the substance of Fleming's customer list from other legitimate sources. Defendants are part way home on their motion.

### 2. *Other Information As to Customers*

■ Fleming also claims trade secret protection for other types of customer information including (Mem. 10–11):

> knowledge of the individual persons at these customers to contact in order to effectuate sales; the prior purchasing history of the customers; the product and service requirements; their present and future projected needs; the packages that Fleming must put together in order to sell particular products; their payment histories; and their buying procedures.

Fleming does not assert any of that information was systematically recorded or compiled in any way, though it says much of the information was supplied to Fleming salesmen in the course of their training (Richard Dotson Aff. ¶ 6). Again Fleming claims to have exerted reasonable efforts to maintain its confidentiality.

Once more that represents only part of the story, and a skewed version at that.

---

**9.** See Appendix.

**10.** Of course the concern about inhibiting fair competition also informs the law of restrictive covenants. In Indiana, as in most jurisdictions,

Fleming seeks to make the "trade secrets" label carry too much baggage. All the information it tries to wrap in the Act's mantle is nothing more than the kind of knowledge any successful salesman necessarily acquires through experience. In the Act's terms, it is information "readily ascertainable by proper means" over the course of time without efforts beyond those ordinarily exerted by salesmen in developing customers.[9]

That is not to say Bailey may not have derived some benefit from his access to the collective experience of Fleming's OEM division (experience to which Bailey himself doubtless contributed significantly during the course of his employment). It is rather to say such information comprises general skills and knowledge acquired in the course of employment. Those are things an employee is free to take and to use in later pursuits, especially if they do not take the form of written records, compilations or analyses. See *MBL (USA) Corp. v. Diekman,* 112 Ill.App.3d 229, 236–37, 67 Ill.Dec. 938, 944, 445 N.E.2d 418, 424 (1st Dist. 1983).

Any other rule would force a departing employee to perform a prefrontal lobotomy on himself or herself. It would disserve the free market goal of maximizing available resources to foster competition. Or to frame the issue in the way discussed earlier in this opinion, it would not strike a proper balance between the purposes of trade secrets law and the strong policy in favor of fair and vigorous business competition.

All this does not render helpless an employer worried that the skills and knowledge an employee acquires during the course of employment will give him or her an undue competitive advantage. Nothing prevents such an employer from guarding its interests by a restrictive covenant.[10]

*Licocci v. Cardinal Associates, Inc.,* 445 N.E.2d 556, 561 (Ind.1983):

> All such covenants as this are in restraint of trade and are not favored by the law. They will be enforced only if they are reasonable

But it would really be unfair competition to allow the employer *without* such a covenant to obtain trade secret status for the fruits of ordinary experience in the business, thus compelling former employees to reinvent the wheel as the price for entering the competitive market. Once again defendants must prevail.

### 3. *Information As to Principals*

■ Fleming Mem. 16 concedes the identity of its principals is widely known and therefore not a trade secret, but it says other principal-related information is: the identity of the contact people, the sales volumes for particular products, the existence of "minor" items provided by principals or other suppliers for use with a principal's products or necessary to permit use of the products, and the terms of Fleming's contracts with principals. No elaboration is required here: All the earlier analysis as to customer-related information applies with equal force. Once more the information is part and parcel of a salesman's experience in the RV business. Bailey naturally carried away from his years at Fleming a familiarity with the contracts, products and personnel of the principals he did business with, not to mention an awareness of what products sold best. For reasons already surveyed the Act's "trade secret" definition simply does not embrace that kind of information.

Fleming tries to bolster its claim by pointing to defendants' possession of some papers containing information about Fleming's relationship with its principals and other suppliers. Bailey discovered those documents, all from the 1981–83 period, in his garage well after this litigation began,

and he produced them in response to a Fleming document request. Bailey has explained he periodically carried papers home during the course of his employment and at one point, well before his resignation, stored them all in a box in his garage (Bailey March 25, 1985 Aff. ¶¶ 3–4). Fleming has offered nothing to contradict that explanation. What really controls, however, is that the specific documents Fleming points to do not—even with all inferences in Fleming's favor as Rule 56 requires—create a *material* fact issue. One of them compiles basic information about a number of Fleming principals, including the commissions each pays to Fleming. But because that information is of the sort Bailey was likely to know anyway, and because there is no evidence to indicate defendants made use of the document,[11] Bailey's mere possession is insufficient to raise a genuine issue of fact.

Also among the papers in the box Bailey found in his garage were invoices with the names of two suppliers who provide Fleming with products for resale. Fleming argues the identity of those suppliers is secret, yet Bailey approached one of them— Runglin International ("Runglin")—in an effort to obtain goods for his new sales company. Fleming says that shows Bailey was making use of information gleaned from the documents he had retained. Defendants, however, point to Grady's own deposition testimony (Grady Dep. 532–35) that he and Bailey traveled to the Orient in 1984 with a Runglin representative to explore foreign supplier sources. Bailey thus knew of Runglin independently of the documents. Again there is nothing to suggest

---

with respect to the covenantee, the covenantor, and the public interest.

But if an express covenant were nonenforceable because of overbreadth, the employer could scarcely expect protection from the common law (or the codified common law) of trade secrets.

**11.** As "evidence" of Bailey's use of the information on the list, Fleming points to Bailey's having approached Vernco, a Fleming principal, proposing to enter into a more advantageous arrangement. Fleming claims that proposition

indicates Bailey was making use of the document. Yet Vernco official Robert Watson has testified *he,* not Bailey, identified the commission he was prepared to pay on a new contract (Watson Aff. 38–39). If anything, that tends to negate Bailey's having used the document as a source of information after his resignation from Fleming. At worst the inference is neutral, for it does not suggest the information on the paper added to Bailey's stock of knowledge for purposes of entering into competition with Fleming.

Bailey's retention of the documents was anything but the oversight he claims it was.

### 4. Conclusion

There is a telling passage at Fleming Mem. 17:

> [T]he RV Business Directory reveals a most important fact concerning Defendants' actions relative to Fleming. The directory lists several hundred manufacturers of equipment utilized by the RV industry. Bailey could easily have undertaken to represent these other manufacturers. Furthermore, Bailey could have solicited the many thousands of manufacturers of equipment not currently involved with the RV business to bring them into that industry as did Ken Lail (Lail Dep., pgs. 227 to 229). However, Bailey chose not to follow this course of action; rather, he went after those principals whom he had personal contact with because of his position with Fleming, that is, Fleming's principals (Bailey Dep., pg. 299).

Fleming unconsciously reveals something of itself: Its desire to attach a "trade secrets" label to its own generalized business skills, and to the skills acquired by Bailey while in its employ, simply to prevent competition by its former employee.

But as the Indiana Court of Appeals stated in *Steenhoven,* 460 N.E.2d at 975 n. 7:

> Insofar as College Life attempts to merely restrain Steenhoven's competition, we believe the Uniform Trade Secrets Act to be an improper vehicle therefor. The fact that Steenhoven possesses certain knowledge acquired within the course of · his employment does not mandate that, upon his departure, Steenhoven must wipe clean the slate of his memory.

So here Fleming may not look to the Act to restrain competition from Bailey, especially given the nature of the information in issue here. Fleming has come forward with

**12.** In this respect the law takes much the same view of anticompetitive legal restraints that John Milton urged in opposing censorship in his great tract on unlicensed printing, *Areopagitica* :

nothing to indicate that the allegedly misappropriated information rose to the "trade secrets" level. Business experience and knowhow as reflected in that information, however valuable, are not something the law protects from the rigors of the marketplace.[12] Defendants' motion is granted as to Count I and its trade secrets claims.

### Slander

Fleming's slander claim against defendants is based on evidence of five statements made by Bailey or those associated with him:

1. In June 1984 John Becker (a Fleming salesman who later joined Unified) told Richard Dotson (who was then or was shortly to become a Fleming employee) Fleming would be out of business before much longer (Dotson Dep. 40–44).

2. Sometime after May 1984 Bailey told Magee he "didn't feel [Fleming] could exist after that time" (Magee Dep. 17).

3. In July 1984 Scott Bailey (Bailey's son and a warehouse employee at Unified) told a truck driver for Fleetwood Industries, Inc. Unified would take away all of Fleming's principal lines and Fleming would be out of business within a year (Duane Conrad Aff. ¶ 6).

4. In September 1984 Scott Bailey made a similar remark to another Fleetwood truck driver (Jerry Wright Aff. ¶ 4).

5. In November 1984 Bailey told Harold Stewart that Sportscoach, a Fleming customer, would be making future purchases from Unified rather than from Fleming.

Fleming argues those statements are per se defamatory, so the evidence of their having been made more than withstands defendants' Rule 56 motion. Defendants respond in two ways:

> Let [Truth] and Falsehood grapple: who ever knew Truth put to the worse in a free and open encounter?

1. Viewed both singly and in the aggregate, the statements are not defamatory per se.

2. Fleming has made no effort to make out a claim of slander per quod by showing special damages.[13]

■ As with Fleming's trade secrets claim, at the threshold this Court must determine the applicable law. Because this too is a tort claim, *Ingersoll*'s "most significant contacts" test again applies (see, e.g., *Velle Transcendental Research Association, Inc. v. Esquire, Inc.*, 41 Ill.App.3d 799, 802, 354 N.E.2d 622, 625 (1st Dist. 1976)). For the most part the assertedly defamatory statements were made in Indiana. More important, given the conceptual nature of defamation as an injury to reputation (*id.*), is the fact Indiana was the site of Fleming's OEM division (the target of the allegedly slanderous statements). Against that the fact that Fleming itself is an Illinois corporation with its general business headquarters in Chicago would seem to carry little weight.[14] Consequently this Court concludes the defamation claim is substantially Indiana-based and will look to Indiana defamation law.

■ Indiana, like most jurisdictions, holds statements slanderous per se if they injure another in his profession or business by imputing lack of ability or unfitness to perform. 18 I.L.E. *Libel and Slander* § 26 (1959 ed. and 1984 pocket part[15]). *Martin v. Indiana Bell Telephone Co.*, 415 N.E.2d 759, 761 (Ind.App.1981) teaches:

> Whether a statement possesses a defamatory meaning or implication is initially a question of law to be determined by the trial court.

Where the entity asserting a per se defamation claim is a corporation rather than an individual, Illinois courts have held (*Garber-Pierre Food Products, Inc. v. Crooks*, 78 Ill.App.3d 356, 360, 33 Ill.Dec. 878, 881, 397 N.E.2d 211, 214 (1st Dist. 1979)):

> Since no question of personal reputation is involved where a plaintiff is a corporation, the alleged defamation must assail the corporation's financial position or business methods, or accuse it of fraud or mismanagement.

Indiana appears to take a similar view. See *Wayne Works v. Hicks Body Co.*, 115 Ind.App. 10, 55 N.E.2d 382, 386 (1944).

■ It is true Indiana has not adopted the "reasonable innocent construction" rule, *Chapski v. Copley Press*, 92 Ill.2d 344, 351–52, 65 Ill.Dec. 884, 887–88, 442 N.E.2d 195, 198–99 (1982), applicable to Illinois defamation cases. But even without giving defendants the benefit of that rule, the complained-of statements cannot be found actionable. Scott Bailey's remarks reflect a combative spirit toward Fleming but do not assail its business methods, management or financial position. John Becker's statements to Dotson and Bailey's remark to Magee are no more than general predictions about Fleming's future, but again they indicate nothing specific about Fleming's business. And Bailey's November 1984 statement says nothing about *why* the customer is ceasing to do business with Fleming. Grady's own characterization of the RV business as volatile precludes a defamatory reading of the mere statement a former Fleming customer will now purchase from Bailey. Moreover Fleming has come forward with no evidence to show

---

**13.** In the current Rule 56 posture, Fleming's burden of showing special damages is one of *proof* (though with the benefit of reasonable inferences). Here Fleming has not even met the far lesser burden of *pleading* such damages (see Rule 9(g)).

**14.** True enough, *Velle* speaks of the "domicile" of the party allegedly defamed and of the corporate plaintiff's "principal place of business." In the present context that simply shifts the inquiry to what "business" should be denoted by that reference. In any case Fleming cannot com-

plain about this Court's resort to Indiana law, for Illinois (with its "reasonable innocent construction" doctrine) would if anything apply a more stringent yardstick to Fleming's defamation claims.

**15.** West Publishing Company prescribes "I.L.E." as the citation form for Indiana Law Encyclopedia, just as it designates the familiar (to Illinois lawyers) "I.L.P." as the way to cite Illinois Law and Practice.

Bailey's November 1984 statement was false—a burden it bears in the face of defendants' Rule 56 motion. As for the other statements, which purport to be no more than predictions, no material fact issue is posed by the present uncertainty whether or not they will come true.[16]

*Wayne Works,* 55 N.E.2d at 386 describes statements there found defamatory per se as to a corporation:

> The letters complained of, imputing as they do that this corporate appellee was in serious financial difficulties, lacked credit, had practically suspended operations, was out of production, had made no commitments for materials for further production and would be unable to fill its orders were, to the extent that they were false, libelous per se, and will support an action for libel without allegation or proof of special damage.

By contrast, the statements ascribed to defendants are altogether lacking in such specific attacks on Fleming's business position. They just do not fit the categories defining per se defamation of a business enterprise. Defendants' motion must be granted as to the Count III defamation claims.

### Rule 11

■ Defendants urge no lawyer, after the reasonable inquiry now required by Rule 11, would have filed a complaint on Fleming's behalf containing Counts I and III. Defendants conclude those charges of trade secrets violation and of slander were included in the Complaint in hopes (Mem. 1):

> of destroying defendant Bailey's fledgling sales representative business through the imposition of costly attorneys' fees.

Fleming's prosecution of this lawsuit certainly does not reflect the highest standards of lawyering. For example, the Complaint also included the claim that defendants misappropriated a sample prod-uct—a dashboard—placed "in the care of Fleming by a company called Georgie Boy [a Fleming customer]" (Complaint ¶ 27). As Fleming well knew, it had no proprietary interest in the dashboard, for it had no hand in developing the product and no contractual arrangement with Georgie Boy. In fact Georgie Boy had shown the sample dashboard to others in the industry before the Complaint was filed. Moreover the Complaint alleged another company, Nu Concepts, which began to manufacture a virtually identical dashboard at about the time the Complaint was filed, had obtained the plans from Bailey. Yet Nu Concepts President Daniel Rothbauer Aff. ¶ 7 says Grady had been informed as early as July 1984—a month *before* the Complaint was filed—that Nu Concepts had *not* received the dashboard model from Bailey. In December 1984 Fleming informed defendants it was withdrawing its allegations concerning the dashboard.

That sequence of events must be viewed as reflecting bad faith on Fleming's part—conduct that justifies the imposition on Fleming of defendants' attorneys' fees (and any other expenses incurred) on that issue. There was no way in which Fleming could have advanced that claim in good conscience, given what it *knew* when the Complaint was filed. And there is equally no justification for forcing defendants to spend time and money to discover what Fleming knew, thus keeping the claim alive for some four months.

Even on the most charitable view, the same conduct a fortiori supports such imposition on Fleming itself under Rule 11's new standards. And it also discloses (at a minimum) its counsel's noncompliance with Rule 11's mandate:

> The signature of an attorney or party constitutes a certificate by him that he has read the pleading, motion, or other paper; that to the best of his knowledge, information, and belief formed after reasonable inquiry it is well grounded in

---

**16.** Indeed as a rule expressions of opinion or judgments of a party are not actionable as defamation per se though "harsh, critical or even abusive." *Garber-Pierre Food Products,* 78 Ill. App.3d at 360, 33 Ill.Dec. at 881, 397 N.E.2d at 214.

fact and is warranted by existing law or a good faith argument for the extension, modification or reversal of existing law, and that it is not interposed for any improper purpose, such as to harass or to cause unnecessary delay or needless increase in the cost of litigation.

Accordingly Fleming and its counsel are held jointly and severally liable for defendants' reasonable expenses (including attorneys' fees) incurred in dealing with the groundless claim regarding the dashboard. This Court will leave it to the lawyers in the first instance to deal with the amounts involved, in hopes of minimizing any pyramiding of fees on fees via an evidentiary hearing.

■ Matters are not as clear as to the bulk of Fleming's Counts I and III, which form the main predicate for defendants' Rule 11 motion. Litigation lawyers have a broad responsibility under Rule 11 and the Code of Professional Responsibility (now the Model Rules of Professional Conduct): to confer with the client about the facts—and not to accept the client's version on faith, but to probe the client in that respect ("reasonable inquiry"); to do the lawyers' homework on the law; and then to counsel the client about just which claims the law reasonable supports in terms of the facts the lawyers' proper investigation has disclosed. That often involves counseling the client—sometimes against the tide of the client's displeasure—as to how best to vindicate the client's interests without abusing another's. In some instances that may involve advising a client not to pursue a claim or a theory of recovery that in a technical sense (of surviving a Rule 12(b)(6) motion) might perhaps go forward, but by rights should not. When a lawyer fails in that respect—when a lawyer accepts or even encourages the role of a "hired gun" in the worst sense—the costs to the parties and to the courts are often substantial, as they have been here.

■ But Rule 11 should be applied with some caution, given its potential for chilling legitimate advocacy. Even in its more expansive form as amended in 1983, it was not designed to penalize litigants because they choose to fight uphill battles, as Fleming has opted for here. Rule 11 does not require a litigant to forego recovery on a particular theory merely because its lawyer may believe there is a good chance of losing (that is one reason for the Rule's reference to "a good faith argument for the extension, modification or reversal of existing law").

■ This Court has given serious thought to mulcting Fleming and its counsel with all the expenses (including lawyers' fees) incurred by defendants on the current questions. Though the issue is a close one, this Court has decided it will not impose overall sanctions under Rule 11.

Just last week our Court of Appeals decided to issue as an opinion the previously unreported (and hence unciteable, see its Circuit Rule 35) order in *Lepucki v. Van Wormer*, 765 F.2d 86 (7th Cir.1985) (per curiam). *Lepucki*, at 87 illustrates why Rule 11 applies to part, but does not quite cover the bulk, of Fleming's Count I and III claims (including the involvement of Fleming's counsel in those claims):

Our system of jurisprudence is designed to insure that all disputants with colorable claims have access to the courthouse. Relatively low barriers to entry have, however, generated an undesirable result—a deluge of frivolous or vexatious claims filed by the uninformed, the misinformed, and the unscrupulous. These claims clog court dockets and threaten to undermine the ability of the judiciary to efficiently administer the press of cases properly before it. Perhaps the greatest safeguard against this danger is the integrity and good sense of practicing lawyers who, as officers of the court, have both an ethical and a legal duty to screen the claims of their clients for factual veracity and legal sufficiency. Model Rule of Professional Conduct 3.1 (1983); Fed.R.Civ.P. 11. Lawyers have a unique opportunity to counsel restraint or recklessness, to craft imaginative arguments or to press empty challenges to well-settled principles. Because of our reluc-

tance to constrain the discretion of attorneys in the vigorous advocacy of their clients' interests, we penalize them only where they have failed to maintain a minimum standard of professional responsibility. But we will not overlook such a failure when it occurs, in part because it evidences disdain for the public, whose claims lie dormant because frivolous suits have diverted away scarce judicial resources, disdain for adversaries, who must expend time and money to defend against meritless attacks, and disdain for clients, whose trust is rewarded with legal bills, dismissals, and court-imposed sanctions.

Even had this Court concluded Counts I and III did pose material fact issues, the thinness of Fleming's case on those claims—plus Fleming's apparent use of this lawsuit itself as a competitive weapon—would make this case a powerful argument for a greater shift toward the British system of taxing fees as part of costs (if not as a matter of course, then under expanded standards). But we are not there yet, and this Court may not pioneer that extra step.

### Conclusion

There is no genuine issue of material fact as to Fleming's trade secret and defamation claims, and defendants are entitled to a judgment as a matter of law on those claims. Complaint Counts I and III are therefore dismissed with prejudice. Defendants' Rule 11 motion is granted with respect to Fleming's claims concerning the Georgie Boy dashboard and denied in all other respects.

### APPENDIX

Fleming has adduced considerable testimony indicating people in the RV business maintain some confidentiality as to the kind of information described at its Mem. 10–11. That reflects nothing more than a truism: No business will gratuitously expose information about its internal affairs. But it is equally true customers seeking the best product at the best price have a clear interest in providing competitors with at least basic information. Indeed the process is well depicted by a deposition excerpt (Kenneth Lail Dep. 78–80) advanced by Fleming itself:

Q. Have you ever attempted to obtain pricing information on competitors' products from customers?

A. Sure.

Q. Have you generally succeeded in obtaining that information?

A. Oh, generally.

Q. Was the information you received correct?

A. I liked to think so. I would say in most cases I feel reasonably certain that it was correct.

Q. Have you generally asked customers what their prices they were paying competitors is (sic)?

A. We do.

Q. Do they generally answer you?

A. In some cases they do. They provide the information. They provide copies of invoices, copies of quotations. In some cases they do not. In other cases you don't ask, and in some cases, you know, they will distort the facts.

Q. Why do you not ask in some cases?

A. Because, you know, it is a fruitless effort to ask. You know, they are not going to provide you the information.

Q. Why did they not provide you the information?

A. Through company policy they don't like to; they don't have the information available; and I'm sure there are other reasons.

Q. Is it prevalent that people or customers will not reveal the prices that they are paying?

A. I would say it is prevalent that you will not get specific pricing terms, conditions and "the" entire competitive profile. I think, however, that you normally get some good, firm information, including all of the above, plus you get ballpark figures that you use to judge the integrity of the other detailed information.

Q. The information that you do not obtain—would that be helpful in order to

compete against the competitors' products?

A. Absolutely.

Q. All right.

A. Any information.

Q. Is there a general understanding in the Industry that this type of information should not be available from the customer?

A. Is there a general understanding? I really cannot—I can answer only my experience and my experience is that I have never gone out for pricing that I didn't get some sort of—some sort of ballpark competitive feedback. But, again, I never go to those people that I know are not going to cooperate. I naturally go immediately to those that I know will cooperate.

That testimony describes in summary form (and with obvious credibility) how a salesman in the ordinary course of his or her affairs develops information about customers and the market in general. Fleming has offered no evidence indicating its own customer information could not be substantially duplicated by similar means. In terms of the determinative issue on the current motion, such information cannot fairly be subsumed under the "trade secrets" rubric.