Carriage Hill Health Care v. Hayden   CV-96-101-SD  04/30/97 P

**UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF NEW HAMPSHIRE**


Carriage Hill Health Care, Inc.


     v.                              Civil No. 96-101-SD


Christopher Hayden;
Benco Dental Supply Co.


                    O R D E R


     This diversity action for breach of contract, interference
with contractual relations, and misappropriation of trade secrets
arose from the alleged wrongful appropriation and use of customer
information by Christopher Hayden from his former employer,
Carriage Hill Health Care, Inc.  Before the court is a motion for
summary judgment filed by defendants Hayden and Benco Dental
Supply Company, to which plaintiff objects.  Also before the
court is defendants' reply memorandum and plaintiff's objection
thereto.


                    Background

     Plaintiff Carriage Hill is a dental supply company in the
New Hampshire and Maine seacoast areas.  Carriage Hill is a

small, fairly new company with only a few employees, including its president, Lorin Gill. In 1992 defendant Hayden began working for Carriage Hill as a salesman, but signed no employment contract or nondisclosure agreements.

Early in 1996 Hayden became dissatisfied with his compensation package from Carriage Hill and began seeking employment opportunities elsewhere. Hayden contacted Stephen Hoyt, the regional sales director for Benco, a large, established dental supplies distributor. Benco is a direct competitor of Carriage Hill in the Maine and New Hampshire dental supplies markets. After interviewing with Hoyt, Hayden was offered and accepted a sales position with Benco.

On February 9, 1996, Hayden submitted a written resignation letter to Gill, at which time he offered to stay on for two weeks, provided Gill could meet Benco's compensation package. Gill declined to do so, and the two agreed that Hayden would come in the following Monday to finalize business matters. The two parted on seemingly good terms, with Gill wishing Hayden "good luck."

Thereafter, the relationship soured. There are allegations, although contested, that Hayden used his key to gain entry to Carriage Hill's office over the weekend and remove certain customer files. On that Saturday, Hayden used Carriage Hill's

2

customer list to send an announcement that he was going to be working with Benco. Hayden failed to report for work at Carriage Hill on that Monday, as agreed. When Hayden called Gill to indicate he would not be coming to the office, Gill instructed him to return the allegedly stolen customer lists, informing him that if he used those "trade secrets" to take unfair advantage, he would be sued. Rather than return said items to Carriage Hill, Hayden gave them to his attorney.

The missing customer information is the basis for this dispute. Carriage Hill claims that Hayden is using this information on Benco's behalf to undercut Carriage Hill's prices and unfairly take business away from it. In its complaint, Carriage Hill alleges (1) that Hayden's conduct in terminating his relationship with Carriage Hill constitutes breach of the covenant of good faith and fair dealing implied in all contracts; (2) that Hayden is tortiously interfering with contractual relations with its customers; and (3) that Hayden tortiously misappropriated information protectable as a trade secret.

## Discussion

## 1. Summary Judgment Standard

Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to a

3

judgment as a matter of law.  Rule 56(c), Fed. R. Civ. P.; <u>Lehman v. Prudential Ins. Co. of Am.</u>, 74 F.3d 323, 327 (1st Cir. 1996). Since the purpose of summary judgment is issue finding, not issue determination, the court's function at this stage "'is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" <u>Stone & Michaud Ins., Inc. v. Bank Five for Savings</u>, 785 F. Supp. 1065, 1068 (D.N.H. 1992) (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249 (1986)).

When the non-moving party bears the burden of persuasion at trial, to avoid summary judgment he must make a "showing sufficient to establish the existence of [the] element[s] essential to [his] case." <u>Celotex Corp. v. Catrett,</u>, 477 U.S. 317, 322-23 (1986).  It is not sufficient to "'rest upon mere allegation[s] or denials of his pleading.'" <u>LeBlanc v. Great Am. Ins. Co.</u>, 6 F.3d 836, 841 (1st Cir. 1993) (quoting <u>Anderson</u>, <u>supra</u>, 477 U.S. at 256), <u>cert. denied</u>, ___ U.S. ___, 114 S. Ct. 1398 (1994).  Rather, to establish a trial-worthy issue, there must be enough competent evidence "to enable a finding favorable to the non-moving party." <u>Id.</u> at 842 (citations omitted).

In determining whether summary judgment is appropriate, the court construes the evidence and draws all justifiable inferences in the non-moving party's favor. <u>Anderson</u>, <u>supra</u>, 477 U.S. at

4

255. Nevertheless, "[e]ven in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990) (citations omitted).

## 2. Obligation of Good Faith and Fair Dealings

Defendants seek summary judgment on Carriage Hill's common law claim for breach of the implied covenant of good faith and fair dealing. Carriage Hill argues that Hayden had an obligation as a contract employee to deal fairly and in good faith with his employer, Carriage Hill, in matters related to the contract. Hayden allegedly breached this obligation when he made use of Carriage Hill's customer information on behalf of Carriage Hill's competitor, Benco.

"The implied covenant of good faith and fair dealing is an example of a common law application of public policy to contract law." Harper v. Healthsource of New Hampshire, Inc., 140 N.H. 770, ___, 674 A.2d 962, 965 (1996). To achieve the goals of public policy, "[t]he obligation of good faith performance [excludes] behavior inconsistent with common standards of decency, fairness, and reasonableness, and with the parties'

5

agreed-upon common purposes and justified expectations." _Centronics Corp. v. Genicom Corp._, 132 N.H. 133, 140, 562 A.2d 187, 191 (1989). However, the legally enforceable covenant itself is not as broad as these initial formulations would suggest. Not all unethical conduct is unlawful, as legally enforceable obligations remain a narrower subset of the broader concept of ethical obligations. The implied covenant of good faith and fair dealing does not prohibit all unethical conduct.

Justice Souter, writing for the New Hampshire Supreme Court, defined the scope of the covenant as follows:

> [U]nder an agreement that appears by word or silence to invest one party with a degree of discretion in performance sufficient to deprive another party of a substantial proportion of the agreement's value, the parties' intent to be bound by an enforceable contract raises an implied obligation of good faith to observe reasonable limits in exercising that discretion, consistent with the parties' purpose or purposes in contracting.

_Id._ at 143, 562 A.2d at 193.

The implied covenant of good faith and fair dealing is not a catch-all cause of action aimed at eradicating all taint of the unethical from contract dealings. Rather, the covenant arises in response to "the particular problem raised by a promise subject to such a degree of discretion that its practical benefit could seemingly be withheld." _Id._ at 144, 562 A.2d at 193. For example, in _Griswold v. Heat Corp._, 108 N.H. 119, 229 A.2d 183

6

(1967), the court held that a contract to pay $200 a month for "such services as [the plaintiff], in his sole discretion, may render", id. at 124, 229 A.2d at 187, required the plaintiff to provide a level of services consistent with good faith.  Under the explicit terms of the contract, the plaintiff retained broad discretion and, in exercise of that discretion, could have rendered no services at all, in which case the defendant would have been denied any benefit under the contract.  In the absence of any contract language indicating how plaintiff's discretion was to be exercised, the court filled the gap with the covenant of good faith which constrained plaintiff's discretion to reasonableness.[1]

The facts of this case distinguish it from those in which the covenant of good faith has been held appropriate.  Here, the contractual discretion that Hayden allegedly abused could not have been exercised in such a manner that Carriage Hill would be denied an essential benefit of the bargain struck in the employment contract with Hayden.  Carriage Hill essentially

---

[1]The Centronics court mentions two other categories of situations to which the doctrine of the implied covenant of good faith and fair dealing is applicable--situations involving standards of conduct relating to contract formation and those involving the limitations of an employer's ability to terminate an employee.  See Centronics id. at 139, 562 A.2d at 191.  The court does not address the doctrine in these contexts because they are not relevant to the instant action.

complains that Hayden wrongfully misappropriated information about its customers. Granted, Hayden's discretion in dealing with the customer information was not limited by contract, and arguably was overbroad, because the contract did not explicitly deny Hayden the discretion to use the customer information on behalf of Carriage Hill's competitors. However, even if Hayden pushed this discretion to its outer limits, Carriage Hill would still have received the essential and primary benefit of its bargain with Hayden in the employment contract. Carriage Hill bargained for Hayden's services, which it had received for a number of years and which was, according to Gill, of satisfactory quality. Gill Testimony, Transcript (Tr.) of May 14, 1996, Hearing before Magistrate Judge at 29. Since the discretion attached to a nonessential aspect of the contract (how customer information would be handled), as opposed to an essential aspect of the contract (i.e., whether or not to render services at all), an abuse of this discretion could not deprive Carriage Hill of an essential benefit of its bargain with Hayden. The implied covenant of good faith and fair dealing only operates to limit overbroad discretion that could, if abused, deprive one party of an essential benefit of their bargain, and is thus inappropriate on these facts. Carriage Hill will not be permitted to invoke

8

the covenant simply because it has been harmed by unethical conduct in the course of contractual dealings with Hayden.

3. Interference with Contractual Relations

Hayden and Benco next seek summary judgment on plaintiff's common law claim for tortious interference with contractual relations. As grounds, defendants argue that there were no contractual ties between plaintiff Carriage Hill and the customer dentists, and, as a matter of law, an action for tortious interference with contractual relations will not lie absent a showing of a formal contract sealing the relation. However, defendants have misstated the law because the absence of a formal contract is not fatal to an action brought under this tort. As noted in W. PAGE KEETON, ET AL., PROSSER AND KEETON ON THE LAW OF TORTS (5th ed. 1984), "it may be tortious to interfere with the plaintiff's prospects of economic gain even where those prospects have not been reduced to a contract right." Id. at 978; see also Demetracopoulos v. Wilson, 138 N.H. 371, 373, 640 A.2d 279, 281 (1994).

However, economic prospects, such as the ones at issue here, that are not formalized by contract are not protected as vigorously as contract relations. As noted by PROSSER AND KEETON, "It has always been agreed that a defendant might intentionally

9

interfere with the plaintiff's interests without liability if there were good grounds for the interferences." Id. at 983. Intentional interference with economic relations is not actionable if the defendant acts with a proper purpose. In a system committed to the free market, the range of permissible reasons to interfere with economic relations must be broader when those relations are merely prospective, expectant, and not sealed by contract. PROSSER & KEETON, supra, at 981 ("Existence of a contract, as distinct from a mere prospect of business, may therefore narrow the range of interference that may be considered proper by a defendant in pursuit of his own ends."). Otherwise, excessively stringent protection of prospective relations threatens to facilitate pockets of monopoly in which one market participant is granted a property right against the world in the prospect of dealing with limited groups of consumers.

So, on the one hand, it has been said that "in a civilized community which recognizes the right of private property among its institutions, the notion is intolerable that a man should be protected by the law in the enjoyment of property once it is acquired, but left unprotected by the law in his efforts to acquire it." Brennan v. United Hatters of North America, 73 N.J.L. 729, 65 A. 165 (1906), reprinted in Prosser and Keeton, supra at 1006. On the other hand, it is equally true that the

10

state should not deviate from its position of neutrality by granting one marketplace competitor excessively broad proprietary rights over limited and scarce resources, such as customers, thereby frustrating another competitor's efforts to acquire property.

Here, the number of potential New Hampshire customers of dental supplies is limited. It would unduly curtail Hayden's economic pursuits to deprive him of the right to solicit business from that limited pool of dentists simply because Carriage Hill was first in time to actively pursue economic relations with these customers. It is clear from the evidence that Hayden did not maliciously desire the interference with Carriage Hill's efforts. Rather, such interference was brought about only as the necessary consequence of Hayden's solicitation of customers for the purpose of advancing his own economic interests. It would disserve equality in market opportunities to saddle Hayden with disadvantage by creating proprietary rights in dental supply customers on behalf of Carriage Hill.

## 3. Claim Brought under the Uniform Trade Secrets Act (UTSA), New Hampshire Revised Statutes Annotated (RSA) 350-B

In its amended complaint, Carriage Hill seeks relief against Hayden and Benco under the UTSA, which prohibits misappropriation

of trade secrets.  Hayden and Benco allegedly misappropriated Carriage Hill's compilation of trade secret information pertaining to its customers of dental supplies.  Hayden allegedly went through Carriage Hill's customer files after his resignation to obtain information including, among other things, the customers' names, addresses, telephone numbers, contact persons, histories, ratings, and potential for future purchases.  According to Carriage Hill, Hayden exploited this information to his advantage in soliciting business for Benco.

"Trade secret" is defined as information that "is not readily ascertainable" from other sources, RSA 350-B:1, IV(a); otherwise, the information cannot be claimed a "secret."  Compiled customer information such as that for which Carriage Hill seeks protection is protectable as a trade secret if it is not "readily ascertainable."  However, trade secret protection extends only to that information not readily ascertainable, but no further.  A vast amalgamation of information is not protectable as a trade secret simply because some of its elements are not readily ascertainable.  Fleming Sales Co. v. Bailey, 611 F. Supp. 507, 513 (N.D. Ill. 1985) ("[I]t is simply unreasonable to construe the Act's 'readily ascertainable' standard as requiring exact duplication of the information on the customer list.").  Conversely, trade secret protection cannot be denied to

12

all elements of compiled information simply because some of them are publicly ascertainable. The compiled information for which Carriage Hill seeks protection will be parsed to determine what, if any, of the information about its customers is not readily ascertainable and properly characterized as a trade secret. Before embarking on this task, it is important to keep in mind the competing policies of trade secret law as they pertain to customer information.

On the one hand, trade secret protection for customer information creates incentives rewarding industry and production. Compiling customer information enhances business efficiency. For instance, customer lists isolate the specialized market of customers who may be interested in a particular service or given product. Such benefits are not without significant costs both in creating a market for the goods and services and in maintaining records of the market's targeted customers. Some customer lists are comprised of customers "'whose trade and patronage have been secured by years of business effort and advertising, and the expenditure of time and money, constituting a part of the good-will of a business which enterprise and foresight have built up' . . . ." Callahan v. R.I. Oil Co., 103 R.I. 656, 660, 240 A.2d 411, 413 (R.I. 1968) (quoting Town & Country House & Home Servs., Inc. v. Newberry, 147 N.E.2d 724, 726 (N.Y. 1958)). Protecting

13

compiled customer information as secret encourages the expenditure of time, money, and energy necessary to initiate creative and individualized plans of marketing fostering constructive competitive results. Employers would be reluctant to invest the necessary resources if former employees were entitled to reap the fruits on behalf of the employer's competitors.

However, business efficiency is only one of the many other interests served by this area of the law. Fleming Sales, supra, 611 F. Supp. at 513 ("[A] court called on to define boundaries in this area must take care to strike a balance between (1) the underlying purposes of trade secret law (to maintain standards of commercial ethics and to encourage research and innovation) and (2) the equally strong policy against inhibiting competition in the marketplace."). Employee mobility must be preserved by permitting employees to retain the knowledge, skill, and experience acquired during the course of employment. This acquired experience is part of the package received by the employee as consideration for his services and may constitute one of his most valuable assets in the job market. Depriving the employee of the use of acquired knowledge threatens to enslave the employee to his current employer by rendering his services less valuable to other prospective employers. Part of the

14

knowledge gained by employment in an industry is acquired by learning who are the customers in that given industry. Employees should be permitted to exploit this resource in order to obtain the full value of their services. "Business experience and know-how as reflected in the information which [an employee] acquired during the course of his [or her] employment is . . . 'not something that the law protects from the rigors of the marketplace.'" AMP, Inc. v. Fleischhacker, 823 F.2d 1199, 1207-08 (7th Cir. 1987) (citing Fleming Sales, supra, 611 F. Supp. at 516).

First, this court will consider whether Carriage Hill's customer lists (including information such as names, addresses, and telephone numbers of its dentist customers) is not "readily ascertainable." This customer list does not represent a market that has been cultivated through expenditure of time, effort, and money. Most of the customers on the list consisted of dentists practicing in the state of Maine, whose potential availability as consumers of dental supplies, in addition to their name, address, and telephone number, were readily ascertainable to anyone in the dental supply business with a Maine telephone directory. The names of Maine dentists and their potential willingness to purchase dental supplies was public, and therefore constituted

15

general knowledge which Hayden was entitled to carry with him to the labor market.

Carriage Hill argues that, even though the name of each individual dentist customer was discoverable from the telephone directory, the customer list represented a unique compilation and subset of Maine dentists not readily ascertainable from other sources. As support for its contention that the list is protectable on this ground, Carriage Hill cites the following passage: "[A] trade secret plaintiff need not prove that every element of an information compilation is unavailable elsewhere. Such a burden would be insurmountable since trade secrets frequently contain elements that by themselves may be in the public domain but together qualify as a trade secret." Boeing Co. v. Sierracin Corp., 738 P.2d 665, 675 (Wash. 1987). However, Carriage Hill has failed to further the argument with evidence that the compilation process was creative or otherwise involved in expenditure of resources. The compilation simply listed Carriage Hill's active customers. The customer list was not, for example, a compilation of the highest volume purchasers of dental supplies in Maine, which would have constituted the type of creative compilation process that trade secret law seeks to reward.

Carriage Hill also asserts that some of the customers on the list were not dentists and made no public displays of willingness to purchase dental supplies. Their potential availability as customers of dental supplies was not, according to Carriage Hill, readily ascertainable from telephone directories. This court would be inclined to accept this argument had Carriage Hill submitted any evidence of which customers were not listed as dentists in telephone directories. However, as Carriage Hill carries the burden of proof on this point, it cannot rest on unsupported and conclusory assertions.

While the list of customers' names, addresses, and telephone numbers does not qualify as a trade secret, some of the other information about Carriage Hill's customers is not readily ascertainable from other sources, and is thus protectable as a trade secret. The list rating Carriage Hill's customers and their potential for future purchases reflects levels of creative compilation and is not ascertainable from other sources. Likewise, information about the prices charged each customer is not readily ascertainable, and becomes an advantageous and valuable tool in the hands of a competitor. Thus, the customer ratings and the purchase histories are protectable trade secrets.

17

The next element of a claim under the UTSA is proof that the trade secret was "misappropriated." The statute provides the following definition:

> II. "Misappropriation" means:
>    (a) Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
>    (b) Disclosure or use of a trade secret of another without express or implied consent by a person who:
>       (1) Used improper means to acquire knowledge of the trade secret; or
>       (2) At the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was derived from or through a person who had utilized improper means to acquire it; or acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or derived from or though a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or
>       (3) Before a material change of his position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

RSA 350-B:1, II.

One court has said the following about the UTSA definition of "misappropriation":

> [T]he right to *announce* a new affiliation, even to trade secret clients of a former employer, is basic to an individual's right to engage in fair competition, and . . . the common law right to compete fairly and the right to announce a new business affiliation have survived the enactment of the UTSA. However, misappropriation occurs if information from a customer database is used to *solicit* customers.

18

MAI Systems Corp. v. Peak Computer, Inc., 991 F.2d 511, 521 (9th Cir. 1993). It is undisputed that Hayden used customer information to announce his new affiliation with Benco, as he was entitled to do. In addition, it is undisputed that Hayden solicited dentists on behalf of Benco who previously did business with Carriage Hill. This, too, Hayden was entitled to do. The dental supply business in Maine is highly competitive, and many of the dentists purchase supplies from and do business with more than one supplier at a time. Affidavit of Dr. F.C. Lamothe at 14 (defendants' appendix in support of motion for summary judgment). Under these circumstances, Hayden was certain to solicit business from certain dentists who happen to have been previous customers of Carriage Hill. Unless Hayden exploited Carriage Hill's customer information to his advantage in soliciting business on behalf of Benco, the UTSA imposes no barriers to free competition between Hayden and his former employer, Carriage Hill.

There is enough evidence in the record that Hayden exploited Carriage Hill's proprietary information in soliciting business for Benco. Circumstantial evidence points to the fact that Hayden used Carriage Hill's customer ratings because the telephone records show that the lion's share of his calls were made to dentists who were rated highly on Carriage Hill's list. Also, there is evidence that Hayden used information concerning

19

Carriage Hill's customers' pricing histories. By affidavit, Debbie Thomas, a purchaser for one of Carriage Hill's customers, swears that Hayden solicited her business, claiming that Benco could "give [her] a better price than Carriage Hill." Affidavit of Debbie Thomas (attached as Exhibit 5 to plaintiff's memorandum in opposition to motion for summary judgment). While this is not particularly strong evidence that Hayden was using Carriage Hill's pricing information, it is enough to survive a motion for summary judgment.

Typically, plaintiff would be required to prove the damages suffered from Hayden's misappropriation of the customer rating and pricing information. Ferrero v. Coutts, 134 N.H. 292, 295, 591 A.2d 1320, 1322 (1991). However, Carriage Hill claims that it cannot present evidence of damages at this stage of discovery because the documentation necessary to do so is uniquely in defendants' possession. Under Rule 56(f), an application for summary judgment can be refused on grounds of the impracticability of production on an element of plaintiff's case. Rule 56(f), Fed. R. Civ. P.

## Conclusion

For the foregoing reasons, defendants' motion for summary judgment (document 41) is granted as to Counts I, II, and III,

20

but is denied as to Count IV.  Their motion for leave to file reply memorandum is denied as moot (document 45).

SO ORDERED.

_____
Shane Devine, Senior Judge
United States District Court

April 30, 1997

cc:    Donald E. Mitchell, Esq.
       Francis X. Quinn, Jr., Esq.